Michael Friedman
Keith N. Sambur
Richards Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281
Telephone:      (212) 530-1800
Facsimile:       (212) 530-1801

*Proposed Counsel to the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>NUTRITION 21, INC., *et al.*,[1]<br><br>　　　　　　　　　　Debtors | Chapter 11<br><br>Case No. 11-<br>Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING THE DEBTORS TO (A) CONTINUE USING THEIR EXISTING CASH
MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS, (B)
CONTINUE INTERCOMPANY TRANSACTIONS AND (C) PROVIDE POSTPETITION
INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE PRIORITY**

Nutrition 21, Inc. ("***Nutrition 21***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), file this motion (the "***Motion***") for entry of interim and final orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, authorizing the Debtors to (a) continue using their existing cash management system, bank accounts and business forms, (b) continue performing ordinary course intercompany transactions and (c) provide postpetition intercompany claims administrative expense priority. In support of the Motion, the Debtors submit the Declaration of Alan Kirschbaum of Nutrition 21, Inc., in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Nutrition 21, Inc. (3613), Nutrition 21, LLC (4596), Iceland Health, LLC (2140) and, Heart's Content, Inc. (5396).  The location of Debtors' corporate headquarters is 4 Manhattanville Road, Purchase, New York, 10577.

1

Support of First Day Pleadings (the "***Kirschbaum Declaration***"). In further support of the Motion, the Debtors respectfully state as follows:

## **Jurisdiction**

1.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.       Venue is proper in this Court under 28 U.S.C. § 1408.

3.       The statutory bases for the relief requested herein are sections 345, 363, 364, 503 and 507 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

## **Background**

4.       On the date hereof (the "***Commencement Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of their chapter 11 cases for procedural purposes only, and no official committees have been appointed.

5.       As set forth more fully in the Kirschbaum Declaration, the Debtors are a nutritional bioscience company headquartered in Purchase, New York. In the twelve months ended June 30, 2011, the Debtors reported revenues of $6.7 million. As of June 30, 2011, the

Debtors reported total assets of $3.5 million and liabilities for GAAP accounting purposes of $18.1 million.[2]

### The Cash Management System, Business Forms and Investment Practices

**A.  Description of the Debtors' Cash Management System**

6.   As described in the Kirschbaum Declaration, the Debtors utilize a centralized cash management system, in the ordinary course of business, to collect, transfer, disburse and invest funds generated by their operations (the "***Cash Management System***").  The Debtors maintain current and accurate accounting records of all daily cash transactions with third parties and by and between Debtor entities.

7.   The Cash Management System is tailored to meet the Debtors' operating needs and reduce administrative expenses and obtain accurate account balances and presentment information.  Maintaining the Cash Management System in its current state will allow the Debtors' management team to focus their efforts on this restructuring rather than cause them to divert attentions to reconstructing a debtor-in-possession cash management system.  Maintaining the current system is also less burdensome to third-parties transmitting funds to the Debtors and will help ensure that payments to the Debtors are received in a timely fashion which is critical given that the Debtors' operations will finance these cases.

**B.  The Debtors' Bank Accounts and Flow of Funds**

8.   The Cash Management System is comprised of four bank accounts maintained at Capital One Bank, N.A. (the "***Bank***") to accommodate different business divisions and to

---

[2] $17,533,000 of these total liabilities are on account of Series J Preferred Stock which is not a "claim" for Bankruptcy Code purposes.

collect, organize and track various forms of customer receipts (collectively, the "**Bank Accounts**").  A description of the Bank Accounts is set forth on Exhibit C.  The Debtors' use the Bank's "Treasury Optimizer Information Reporting and Transaction Services" proprietary program to effectively manage the inflow of various receipts, monitor Bank Account balances and perform various cash transactions.

9. As part of their daily operations, the Debtors collect cash, checks and wire payments from their operations.  These amounts are deposited into either Debtor Nutrition 21, LLC's operating account or Debtor Nutrition 21's operating account, as applicable, which are designated as such (the "***Operating Accounts***").  The other Debtors do not receive any payments.  Funds in the Debtor Nutrition 21, LLC Operating Account is swept at the end of each day to Debtor Nutrition 21's operating account.  Disbursements are then made from either Debtor Nutrition 21's or Debtor Nutrition 21, LLC's operating account, as applicable.  When Debtor Nutrition 21, LLC needs to make a disbursement, necessary funds from Nutrition 21's operating account are transferred to its operating account.

10. Any excess cash is currently held in a money market account in the name of Debtor Nutrition 21 (the "***Money Market Account***").  Nutrition 21 also maintains a credit card account.

C. **Intercompany Claims and Inter-Debtor Transactions**

11. In the ordinary course of business, the Debtors maintain business relationships with their Debtor affiliates, which result in intercompany receivables and payables (the "Intercompany Claims") arising from the following types of transactions (the "Intercompany Transactions"):

- Expense Allocations. In the ordinary course of business, Debtor Nutrition 21 pays expenses on behalf of all of the Debtors, including insurance premiums, workers' compensation obligations, wages and benefit costs, and information technology costs. Nutrition 21 pays these expenses and then allocates them to the appropriate affiliates.

- Allocations. As described above, in the ordinary course of business, Nutrition 21, LLC transfers cash to Nutrition 21. This creates Intercompany Claims in favor of Nutrition 21, LLC. When Nutrition 21, LLC must make disbursements, funds from Nutrition 21's operating account are transferred to it resulting in reduction of its Intercompany Claims against Nutrition 21.

12. Intercompany Claims. The Debtors maintain a well-documented system of Intercompany Transactions and Intercompany Claims resulting from the cash flow between the Debtors. Because the Debtors maintain records of all Intercompany Transactions (including fund transfers) they can ascertain, trace and account for the Intercompany Transactions and Intercompany Claims. At the same time, if Intercompany Transactions were to discontinued, the Cash management System and related administrative controls would be disrupted.

**D.     The Debtors' Existing Business Forms and Checks**

13. In the ordinary course of business, the Debtors use a multitude of checks. Additionally, the Debtors use a variety of correspondence and pre-printed business forms, including, but not limited to, letterhead.

14. In order to minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the

Commencement Date, without reference to the Debtors' status as debtors in possession; *provided, however,* that in the event that the Debtors generate new checks during the pendency of these cases other than from their existing stock of checks, such checks will include a legend referring to the Debtors as "Debtor in Possession." The Debtors also seek authority to use all correspondence and other business forms that are pre-printed without reference to the Debtors' status as debtors in possession.[3]

15. The Debtors have a small number of parties they do business with and those parties will undoubtedly be aware of the Debtors' status as debtors in possession as a result of the notice these parties will receive concerning the commencement of these cases.

16. Changing the Debtors' existing checks, correspondence, and other pre-printed business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. The disruption and expense caused would be great in comparison to the limited benefit upon those dealing with the Debtors. For these reasons, the Debtors request that they be authorized to use existing check stocks and all correspondence and pre-printed business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

**Relief Requested**

17. By this Motion, the Debtors seek entry of an order authorizing them to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as

---

[3] Although the UST Requirements would require the Debtors to obtain and use new checks bearing the "Debtor in Possession" designation, the Debtors do not believe that they impose any limitation on the Debtors' other correspondence and business forms. Nevertheless, out of an abundance of caution, the Debtors seek explicit authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

debtors in possession; (c) use, in their present form, all pre-printed correspondence and business forms and other documents related to the Bank Accounts existing immediately before the Commencement Date, without reference to their status as debtors in possession, *provided, however,* that in the event the Debtors generate new checks during the pendency of these chapter 11 cases, such checks shall include a legend referring to the Debtors as "Debtors in Possession"; and (d) continue, in their business judgment and at their sole discretion, performing Intercompany Transactions in the ordinary course of business.

18. The Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks or other items deposited in the Bank Accounts prior to the Commencement Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Commencement Date; and (ii) undisputed, outstanding service charges owed to the Banks as of the Commencement Date on account of the maintenance of the Debtors' Cash Management System, if any.

19. The Debtors also request that the Order be entered on an interim basis, and, in the absence of objections to the interim relief granted, become final on the date specified in the Order.

**Basis for Relief**

I. **The Court Should Approve the Debtors' Continued Use of the Cash Management System.**

20. The U.S. Trustee Guidelines require, among other things, that unless the Court orders otherwise, a debtor: (a) establish one debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes); (b) close all existing bank accounts and open new debtor in possession accounts, (c) maintain a separate debtor in possession account for cash collateral, (d) obtain checks that bear the designation "debtor in possession" and (e) reference the bankruptcy case number and the type of account on such checks. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Commencement Date. Strict enforcement of those guidelines in these chapter 11 cases, however, would disrupt the ordinary financial operations of the Debtors, cause unnecessary expense and distract the Debtors' management from the stated task of obtaining the highest and best offer for the sale of the Debtors' assets.

21. Bankruptcy courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.,* 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This is particularly true where, as here, a chapter 11 case involves affiliated debtors with integrated cash management systems. In *In re Charter Co.,* 778 F.2d 617 (11th Cir. 1985), for example, a bankruptcy court entered an order authorizing the debtor and its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity ... .". *Id.* at 620. The

Eleventh Circuit Court of Appeals further indicated that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621.

22. Likewise, the bankruptcy court in the *Columbia Gas* chapter 11 case explained that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.,* 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part and rev'd in part,* 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom, Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.,* 510 U.S. 1110 (1994); *see also In re US Airways, Inc.,* Case No. 04-13819 (Bankr. E.D. Va. Sept. 14, 2004). As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *In re Columbia Gas,* 997 F.2d 1039, 1061; *see also In re Southmark Corp.,* 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

23. Forcing the Debtors to create a new Cash Management System would prove disruptive to the Debtors' operations as they would need to execute new signatory cards and depository agreements and create an entirely new manual system for issuing checks and paying postpetition obligations, all as generally would be required by the U. S. Trustee Guidelines. *See* U. S. Trustee Guidelines, at pp. 2-3. The Debtors would also have to alert third-parties of this new account information and hope that these parties remit payment appropriately. Thus, the Debtors' chief financial officer, would be forced to focus almost exclusively on immediately

9

opening new bank accounts and alerting third-parties, instead of focusing on the Debtors' proposed sale and maximizing value.  Given the Debtors' desire to selling substantially all of their assets swiftly these burdens clearly weigh against the Debtors' establishing a new cash management system for such a limited time.

24. Moreover, continued use of the Cash Management System will greatly facilitate their transition into these chapter 11 cases by, among other things minimizing delays in receipt of payment for goods sold.  This is particularly important because the Debtors are funding their operations entirely from business operations.  Disruption to the flow of funds could therefore cause serious damage to the Debtors' ability to operate as a going-concern.

II. **The Debtors Should Be Granted Authority
To Use Existing Business Forms and Checks Until They Are Depleted.**

25. To minimize expenses to their chapter 11 estates, the Debtors request authority to continue to use all pre-printed correspondence and business forms (including letterhead) as such forms were in existence immediately before the Commencement Date, without reference to the Debtors' status as debtors in possession.  The Debtors also request authorization to use their existing check stock without the "debtor in possession" label for checks that they manually write until such check stock runs out.  As soon as practicable after the Commencement Date, the Debtors will include "debtor in possession" on the checks they print electronically.

26. Given the anticipated short duration of these cases and expenses it would cost to obtain new pre-printed forms, the Debtors should be permitted to continue to use their existing checks and other pre-printed business forms without alteration or change.  Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as

debtors in possession as a result of the notices received concerning these cases changing business forms is unnecessary and unduly burdensome.

### III. The Debtors Should Be Authorized to Continue Using Debit or Wire Payments.

27. The Debtors request further relief from the requirement in the U.S. Trustee Guidelines that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. The Debtors, like their counterparties, frequently conduct transactions by debit, wire or payments. To deny the Debtors the opportunity to conduct transactions by debit, wire or other similar methods would likely interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to be borne by the Debtors and their creditors. Again, these disruptions could cause serious harm to the Debtors' estates.

### IV. The Debtors Should Be Authorized to Continue Performing Under the Intercompany Transactions Involving Debtors and Non-Debtors.

28. As described herein, the Debtors' businesses are operationally and functionally linked. In order to permit ordinary course operations of the Debtors' business and to preserve the value of their investments in their non-Debtor subsidiaries, the Intercompany Transactions with foreign subsidiaries must be preserved to the degree requested herein. If the Intercompany Transactions were discontinued, a number of services currently provided and currently maintained by the Debtors would be disrupted. The Debtors have already modified certain intercompany functions to limit the degree and scope of certain transactions between Debtors and non-Debtors. Any further modifications would be counterproductive in that they would risk causing serious operational and business disruptions for the Debtors, their non-Debtor

subsidiaries, or both. Accordingly, the Debtors respectfully submit that the continuation of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such Intercompany Transactions.

29. At any given time, there may be balances due and owing between and among Debtor affiliates. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. Thus, the Debtors respectfully request the authority, in their sole discretion, to continue performing under the Intercompany Transactions, as described herein, in the ordinary course of business without need for further Court order.

**V.     Granting Administrative Priority Status to Postpetition Intercompany Claims Is Necessary to Protect the Debtors' Claims.**

30. The Debtors' funds are commingled in the Cash Management System, and the individual Debtors' rights with respect to funds input into that system are documented by intercompany book entries reflecting intercompany claims, dividends and investments among the participants in the Cash Management System in the ordinary course. The Debtors track all fund transfers electronically in their accounting system and can ascertain, trace and account for all Intercompany Transactions. If the Intercompany Transactions that permit use of the Cash Management System were to be discontinued, that system and related administrative controls would be disrupted to the Debtors' detriment. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' sale efforts.

31.     Although the Debtors' creditors have claims against only Debtor Nutrition 21 and the Debtors anticipate that all claims will be paid in full, to further protect against any unintended harm, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor arising after the Commencement Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative priority expense status.  If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

## VI.     Honoring Payments; Rights of Bank

32.     In connection with the relief requested above, the Debtors further request that the Bank receive authorization to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor and pay any and all checks, drafts or wires issued and drawn on the Bank Accounts by the holders or makers thereof to the extent the Debtors have good funds standing to their credit with such Bank, after the Commencement Date by the holders or makers thereof, as the case may be; provided, however, the Bank shall not be liable to any party on account of (a) following the Debtors' representations, instructions, or presentations as to any order of the Court (without any duty of further inquiry), (b) the honoring of any prepetition checks, drafts or wires in good faith belief or upon a representation by the Debtors that the Court has authorized such prepetition check, draft or wire or (c) an innocent mistake made despite implementation of reasonable handling procedures.  The Debtors also request that any payment from a Bank Account at the request of the Debtors made by any of the Bank prior to the Petition Date, or any

instruments issued by the Bank on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, be deemed to be paid prepetition, whether or not actually debited from such Bank Account prepetition.

33. In accordance with the Banks current procedures and policies, the Debtor seek permission to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Bank may be entitled under the terms of its contractual arrangements with the Debtors.

34. Finally, as to not prejudice the Bank, to the extent the Bank has valid and enforceable rights of setoff or liens in cash present in a Bank Account on the Commencement Date (the "*Commencement Date Cash*"), and to the extent such cash is thereafter used by a Debtor subject to further agreement between the Debtor and such Bank, such Bank is hereby granted (i) a replacement lien in the Debtors' cash, and such replacement lien shall be of the same extent and priority as such Bank's interest, as of the Commencement Date, in the Commencement Date Cash subsequently used by the Debtors; and (ii) an administrative expense claim to the extent of any diminution of Commencement Date Cash after the Commencement Date.

**Requirements of Bankruptcy Rule 6003 Satisfied**

35. Under Bankruptcy Rule 6003, the Court may authorize the Debtors to continue using the Cash Management System because such relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In*

*re Ames Dep't Stores, Inc.,* 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); *see also* Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

36. The Cash Management System is crucial to the Debtors' continued operations. Without the Cash Management System, payments may not be made in a timely manner and the Debtors would be unable to track incoming receipts efficiently. Late payments (made or received) may cause the Debtors to be unable to finance their operations in these chapter 11 cases which would prevent them from operating as a going concern. This could cause diminution in the value of the Debtors' estates to the detriment of all parties in interest. As a result, it is clear that immediate and irreparable harm would result without the relief requested herein being granted.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

37. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Motion Practice

38. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

39. The Debtors have caused notice of this Motion to be provided by electronic mail, facsimile, and/or by overnight mail to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims; (c) Series J Preferred Shareholders' Counsel (as defined in the Kirschbaum Declaration); (d) the Internal Revenue Service; (f) the Securities and Exchange Commission; and (g) the Bank. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## No Prior Request

40. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the Kirschbaum Declaration, the Debtors respectfully request that the Court (a) enter interim and final orders, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

Dated: August 26, 2011
New York, New York

        <u>/s/ Michael Friedman</u>
        Michael Friedman
        Keith N. Sambur
        Richards Kibbe & Orbe LLP
        One World Financial Center
        New York, New York 10281
        Telephone:  (212) 530-1800
        Facsimile:  (212) 530-1801

        *Proposed Counsel to the Debtors and Debtors in Possession*