Michael Friedman
Keith N. Sambur
Richards Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281
Telephone:     (212) 530-1800
Facsimile:     (212) 530-1801

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>NUTRITION 21, INC., *et al.*,[1]<br><br>                                        Debtors | Chapter 11<br><br>Case No. 11-<br>Joint Administration Requested |

**DECLARATION OF ALAN KIRSCHBAUM (A) IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS AND
(B) PURSUANT TO LOCAL RULE 1007-2**

I, Alan Kirschbaum hereby declare under penalty of perjury:

1.       I am the chief financial officer and vice president, finance and treasury of Debtor

Nutrition 21, Inc. (**"*Nutrition 21*"**) one of the above-captioned debtors and debtors in possession

(collectively, the **"*Debtors*"**).  I am also the chief financial officer of Debtor Nutrition 21, LLC,

Debtor Heart's Content, Inc. and Debtor Iceland Health, LLC.

2.       I was appointed as chief financial officer of Nutrition 21 on May 26, 2006.  From

July 2002 to April 2006, I served as vice president, finance and treasury, and principal

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Nutrition 21, Inc. (3613), Nutrition 21, LLC (4596), Iceland Health, LLC (2140) and, Heart's Content, Inc. (5396).  The location of Debtors' corporate headquarters is 4 Manhattanville Road, Purchase, New York, 10577.

accounting officer.  From December 1998 to June 2002, I served as controller.  Prior to joining the Debtors, I was Vice President and Controller of AMS Asset Management Services.  From 1984 to 1996, I held a series of financial positions, each increasing in responsibility, with Ascom Timeplex, Inc.  I am a certified public accountant and hold a B.S. from Pennsylvania State University, and an M.B.A. from Pace University.

3.     I submit this declaration (this **"*Declaration*"**) pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the **"*Local Rules*"**), and I am authorized to submit this Declaration on the Debtors' behalf.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge of the Debtors' operations and finances, information learned from my review of the relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors.  If I were called upon, I would testify to the facts set forth herein on that basis.

**Part I.**
**Overview of the Debtors' Operations**

4.     The Debtors are an integrated nutritional bioscience company formed in New York on June 29, 1983 under the name Applied Microbiology, Inc.  The Debtors are headquartered in Purchase, New York.  As of the date hereof, (i) Debtor Nutrition 21 employs a chief executive officer, chief financial officer and vice president of finance and treasury, vice president of research and development and scientific affairs, a vice president secretary and general counsel, a manager of information technology, a director of operations, a manager of accounting and three administrative assistants and (ii) Debtor Nutrition 21, LLC employs a vice president of operations, sales and marketing and a manager of customer relations.  Debtors Iceland Health, LLC and Heart's Content, Inc. each have no employees, assets or liabilities.

5.      Debtor Nutrition 21 directly owns 100% of the equity interests of each of the other Debtors.

6.      Prior to 1995, the Debtors' primary focus was on the development and commercialization of antibacterial technologies for new drugs.  The Debtors subsequently licensed these antibacterial technologies to third parties.  Beginning in 1995, the Debtors shifted focus to developing and marketing raw materials, formulations, compounds, blends and bulk and other materials (**"*Ingredients*"**) to third-party non-end users.  These non-end users further fabricate, blend and/or packaged the Ingredients for ultimate sale to end-users as nutritional supplements or otherwise.  The Debtors have 54 issued patents and 24 pending patents along with trademarks and licenses for combinations of dietary supplements and prescription drugs.

7.      Chromax Chromium Picolinate (**"*Chromax*"**) is the Debtors' primary ingredient product in which various combinations are covered by both domestic and international composition of matter and use patents.  Chromax is a proprietary mineral compound with more than a decade of clinical research used to restore normal glucose metabolism by enhancing insulin sensitivity. Chromax may also reduce the risk of Type 2 diabetes.  Chromax is also marketed and sold as a weight loss suppressant.

8.      Chromax is also sold into the animal feed market for managing the health of breeding sows and their offspring.

9.      To support the sale of Chromax, the Debtors actively promote research findings and pronouncements regarding the safety of Chromax to functional food manufacturers including health and consumer product distributors.  During fiscal years ended June 30, 2011, 2010 and

2009 sales of Chromax accounted for approximately 79%, 71%, and 74%, respectively, of the Debtors' total revenues.

10.     The Debtors also market and sell other mineral compounds such as Selenomax and SelenoPure Selenium and Zinmax Zinc Picolinate.  Selenium products are used by some as a means of reducing the risk of certain types of cancer, cardiovascular disease, strokes, damage to fat cells, plaque formation in the arteries, and macular degeneration.  Zinc picolinate is an essential mineral that stimulates the activity of approximately 100 enzymes and helps maintain a healthy immune system.

11.     In fiscal year 2010, the Debtors launched Probiomega, a unique combination of a patented probiotic and omega 3 fatty acids.  Probiomega is the only probiotic and fish oil combination that provides a unique combination that may lead to improved heart and gut health.

12.     The Debtors derive additional revenues from the sale and licensing of Chromax and other products to customers who incorporate these products into other finished multi-ingredient nutritional supplement products.  These include vitamin/mineral formulas, weight loss and sports nutrition supplements, "nutritional" bars, drink mixes and "nutritional" beverages. These products are sold by the Debtors' customers under a variety of brands through natural/health food stores, supermarkets, drug stores, and mass merchandisers, as well as through direct and catalogue sales.

13.     Because the Debtors do not sell directly to end-users, the products are sold to customers under various agreements that provide the customer with a license to use certain patents and other intellectual property of the Debtors.  The fee for this license is bundled on an unallocated basis with the price that the Debtors charge for the ingredients.  Under various

license agreements, certain of the Debtors' customers license Chromax and manufacture and distribute it as a stand-alone chromium supplement that is marketed either under their own private labels or in conjunction with their vitamin, mineral and supplement lines. In fiscal year 2011, three customers accounted for approximately 28% of the Debtors' total revenues, while in fiscal year 2010, three customers accounted for 39% of the Debtors' total revenues. In fiscal year 2009, one customer accounted for 24% of the Debtors' total revenues.

**Part II.**
**The Debtors' Financial Difficulties**

14.     In 2006, the Debtors decided to expand their operations by selling their products to end-users via the  retail and the direct response channels, through its own branded products group (the **"*Branded Products Group*"**).

15.     In order to finance its entry into the retail space, the Debtors raised additional capital. Historically, the Debtors had primarily financed their operations through the issuance of various equity securities, plus internally generated cash flow from business operations. The Debtors were rarely a party to any debt agreements (secured or otherwise) and are not party to any current debt agreements. The financing of the launch of Branded Products Group was no different. On September 10, 2007, Nutrition 21 entered into a Securities Purchase Agreement pursuant to which Nutrition 21 sold 17,750 shares of 8% Series J Convertible Preferred Stock (the **"*Series J Preferred Stock*"**) which were convertible into common shares of Nutrition 21 and warrants to purchase 6,715,218 shares of common stock for $17,750,000.

16.     This move into the various market segments with an expensive mass-market model ultimately proved unsuccessful, and a new chief executive officer was recruited to lead a

turnaround.  In December 2009, Debtor Nutrition 21, Inc. sold its assets related to the Branded Products Group to Nature's Products, Inc. and its affiliates at a significant loss.

17.     In addition to losses incurred in connection with the Branded Products Group, the Debtors did not achieve positive levels of earnings before interest, taxes, depreciation, and amortization ("EBITDA") or operating income due to general economic deterioration until 2009. During fiscal years 2002 through 2008, the Debtors failed to achieve positive EBITDA, and the Debtors did not achieve positive operating income from fiscal year 2005 through fiscal year 2008.  The Debtors produced EBITDA of $1.1 million in fiscal year 2009 followed by EBITDA of $2.3 million in fiscal year 2010.  As of the twelve months ended June 30, 2009, the Debtors reported approximately $14,823,000 of total assets and in the twelve months ended June 30, 2010, reported total assets of approximately $3,962,000.  For the twelve months ended June 30, 2011 the Debtors reported total assets of approximately $3,462,000.

18.     As of the Petition Date, all of the Series J Preferred Stock remains outstanding and has not been converted into common shares.  The Series J Preferred Stock[2] contains a mandatory redemption provision which holders of the Series J Preferred Stock contend require redemption by Nutrition 21 on September 11, 2011 for a cash payment of $17,750,000.

### Part III.
### The Debtors' Restructuring Efforts

19.     As a result of the losses suffered by the Debtors, the Debtors would be unable to redeem the Series J Preferred Stock and, as a result, were compelled to explore strategic

---

[2] The Debtors and more than 67% of the holders of the Series J Preferred Stock along with their counsel (the "**Series J Preferred Shareholders' Counsel**") have been in active dialogue regarding the Debtors' bankruptcy filing and the sale of their assets as further described below and have entered into a plan support agreement.  The plan support agreement provides, among other things, that the holders of the Series J Preferred Stock party thereto will support the sale of the Debtors' assets and a plan of reorganization consistent with certain terms specified in the plan support agreement.  Notice of all First Day Pleadings have been provided to the Series J Preferred Shareholders' Counsel.

alternatives for restructuring their balance sheet. The Debtors met with certain large holders of the Series J Preferred Stock in the spring of 2010 to explore an extension and restructuring of those securities, but these discussions were not successful. In November 2010, the Debtors retained BDO Capital Advisors, LLC ("**BDO Capital**") to perform an evaluation of the Debtors' strategic options. After its evaluation, BDO Capital concluded that the Debtors should pursue a sale of substantially all of their assets. Following review of this proposal by Nutrition 21's Board of Directors, beginning in January 2011 BDO Capital, with the Board of Directors' approval, contacted over 220 parties to determine if they were interested in purchasing the Debtors' assets. In response to these marketing initiatives, by the end of March, BDO received eight written indications of interest.

20. Thereafter, the Debtors focused their efforts on negotiating with three of the parties that submitted formal letters of intent. In April, the Debtors executed a letter of intent with one potential purchaser, and this party conducted additional due diligence in connection with the contemplated transaction. For a variety of reasons, the Debtors were unable to reach a definitive agreement with this party, and by late July the Debtors decided to focus their efforts on identifying a possible purchaser to serve as a stalking horse in connection with a Bankruptcy Code section 363 sale. To this end, BDO Capital reinitiated discussions with approximately a dozen potential purchasers regarding such a transaction. By August 2011, while a number of parties expressed interest in bidding at an auction, none were willing or able, due to time constraints, to serve as a stalking horse bidder. Although there is currently no stalking horse bidder, as a result of the Debtors' and BDO Capital's extensive marketing efforts, the Debtors

are confident that a highly competitive Auction can take place expeditiously and that the Auction and resulting Sale will be favorable to and in the best interests of the Debtors' estates.

21.     In order to effectuate a sale of the Debtors' assets, under New York law, two-thirds of Debtor Nutrition 21's common shareholders must consent to such a sale. During February to June BDO Capital, at the Debtors' request, held numerous discussions with the Series J Preferred Shareholders to determine if they would be willing to share a portion of the sales consideration with Nutrition 21's common shareholders to incentivize shareholders to approve the asset sale. However, no agreement was ultimately reached with the Series J Preferred Shareholders. As result, the Debtors concluded that it would not be able to secure the requisite consent for a sale and therefore determined that it was necessary to effectuate the sale of their assets in bankruptcy. Accordingly, the Debtors sought Bankruptcy Code protection.

**Part IV.**
**First Day Motions**

22.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions,[3] the Sale Motion and the Retention Applications (each as defined below). I believe that, among other things, the relief requested in each of the First Day Motions, the Sale Motion and the Retention Applications is necessary to enable the Debtors to operate with minimal disruption during the pendency of the Chapter 11 Cases. A description of the relief requested and the facts supporting each of the pleadings (other than with respect to pleadings regarding the retention of estate professionals) is set forth below.

**A. Administrative Motions**

---

[3] The "***First Day Motions***" are the Joint Administration Motion, the Equity Security Holder Notice Motion, the Wages and Benefits Motion, the Cash Management Motion and the Utility Providers Motion (each as defined herein). Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Motion or the Sale Motion, as applicable.

i. Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "*Joint Administration Motion*")

23.     The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Nutrition 21, Inc.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than Nutrition 21, Inc. to indicate the joint administration of the chapter 11 cases.

24.     Joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will be filed in the chapter 11 cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.

25.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

ii. Debtors' Motion for Entry of an Order Authorizing the Debtors to Prepare a List of Equity Security Holders Using Certain Record Holder Information and Provide Notice in the Ordinary Course (the "*Equity Security Holder Notice Motion*")

26.     The Debtors request entry of an order authorizing Debtor Nutrition 21 to prepare a consolidated list of equity security holders for notice and other purposes using record holder information maintained by American Stock Transfer & Trust Company.  Nutrition 21's common shares are publicly traded on the Over The Counter Bulletin Board under the symbol "NXXI" and are registered with the Securities and Exchange Commission.  Certain beneficial holders of these equity securities own them through a broker-dealer or nominee such as Cede &Co. and therefore, Nutrition 21 is unable to ascertain the beneficial holders of 100% of Nutrition 21's common shares.  As a result, Nutrition 21's practice prior to the Commencement Date, was to provide notice of any vote or action to the Record Holders and Select Beneficial Holders through the record holders of these securities, rather than providing notice to the beneficial holder of these securities Broadridge Financial Solutions, Inc.  Through this Equity Security Holder Notice Motion, the Debtors seek entry of an order, authorizing Nutrition 21 to provide notice to Record Holders and Beneficial Holders through prepare a list of equity security holders for notice and other purposes using (i) the names and addresses of the record holders of such equity security holders and (ii) the number of equity securities held by each record holder, in each case as reflected in the Debtors' books and records, rather than preparing a list using the names and amounts held by beneficial holders Broadridge Financials Solutions, Inc.

27.     I believe that providing notice in such a manner would be appropriate and reasonable under the circumstances because it is consistent with how Nutrition 21 has communicated with its equity security holders prior to the Commencement Date.

**B.  Operational Motions Requesting Immediate Relief**

28.     The Debtors intend to ask for relief with respect to the following First Day Motions and, therefore, will present these motions at the First Day Hearing.

    i.    Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Benefits Programs (the "***Wages and Benefits Motion***")

29.     The Debtors request the entry of interim (except as it relates to the Debtors' Severance Policy) and final orders authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries and other compensation, taxes, withholdings and related costs and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance and other benefits programs, including severance for non-insider employees and (c) continue their employee medical, insurance and other benefits programs on a postpetition basis.

30.     Although the Debtors have paid their wage, salary and other Employee obligations in accordance with their ordinary compensation schedule prior to the Commencement Date, as of the date hereof, certain prepetition Employee Obligations may nevertheless be due and owing.

31.     I believe the majority of the Debtors' Employees rely on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses.  Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.  In the absence of such payments, I believe that the Debtors' Employees may seek alternative employment opportunities thereby hindering the Debtors' ability to maximize the value of their assets in these chapter 11 cases.

32.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.

    ii.   Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Continue Intercompany Transactions and (C) Provide Postpetition Intercompany Claims Administrative Expense Priority (**"Cash Management Motion"**)

33.     The Debtors request authorization to (a) continue using their existing cash management system, bank accounts and business forms, (b) continue performing ordinary course intercompany transactions and (c) provide postpetition intercompany claims administrative expense priority status.

34.     The Debtors utilize a centralized cash management system, in the ordinary course of business, to collect, transfer, disburse and invest funds generated by their operations (the "**Cash Management System**").  The Debtors maintain current and accurate accounting records of all daily cash transactions with third parties and by and between Debtor entities.

35.     The Cash Management System is comprised of four bank accounts maintained at Capital One Bank, N.A. (the "**Bank**") to accommodate different business divisions and to collect, organize and track various forms of customer receipts (collectively, the "**Bank Accounts**").  The Debtors' use the Bank's "Treasury Optimizer Information Reporting and Transaction Services" proprietary program to effectively manage the inflow of various receipts, monitor Bank Account balances and perform various cash transactions.

36.     As part of their daily operations, the Debtors collect cash, checks and wire payments from their operations.  These amounts are deposited into either Debtor Nutrition 21,

LLC's operating account or Debtor Nutrition 21's operating account, as applicable, which are designated as such (the "***Operating Accounts***"). The other Debtors do not receive any payments. Funds in the Debtor Nutrition 21, LLC Operating Account is swept at the end of each day to Debtor Nutrition 21's operating account. Disbursements are then made from either Debtor Nutrition 21's or Debtor Nutrition 21, LLC's operating account, as applicable. When Debtor Nutrition 21, LLC needs to make a disbursement necessary funds are transferred to its operating account. Any excess cash is currently held in a money market account in the name of Debtor Nutrition 21 (the "***Money Market Account***"). The Debtors also maintain a credit card account.

37. In the ordinary course of business, the Debtors maintain business relationships with their Debtor affiliates, which result in intercompany receivables and payables (the "***Intercompany Claims***") arising from the following types of transactions (the "***Intercompany Transactions***"):

- Expense Allocations. In the ordinary course of business, Debtor Nutrition 21 pays expenses on behalf of all of the Debtors, including insurance premiums, workers' compensation obligations, wages and benefit costs, and information technology costs. Nutrition 21 pays these expenses and then allocates them to the appropriate affiliates.

- Allocations. As described above, in the ordinary course of business, Nutrition 21, LLC transfers cash to Nutrition 21. This creates Intercompany Claims in favor of Nutrition 21, LLC. When Nutrition 21, LLC must make disbursements funds are transferred to it resulting in reduction of its Intercompany Claims against Nutrition 21.

- Intercompany Claims. The Debtors maintain a well-documented system of Intercompany Transactions and Intercompany Claims resulting from the cash flow between the Debtors. Because the Debtors maintain records of all Intercompany Transactions (including fund transfers) they can ascertain, trace and account for the Intercompany Transactions and Intercompany Claims. At the same time, if Intercompany Transactions were to discontinued, the Cash management System and related administrative controls would be disrupted.

38.	In the ordinary course of business, the Debtors use a multitude of checks. Additionally, the Debtors use a variety of correspondence and pre-printed business forms, including, but not limited to, letterhead.

39.	The Debtors have a small number of parties they do business with and those parties will be made aware of the Debtors' status as debtors in possession.

40.	Changing the Debtors' existing checks, correspondence, and other pre-printed business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.

 iii. Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "***Utility Providers Motion***")

41.	In the ordinary course of their businesses, the Debtors incur utility expenses for telecommunication services from AT&T and Verizon (the "Utility Providers").  On average, the Debtors spend approximately $8,300 each month on utility costs.  Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption in utility services would disrupt the Debtors' ability to continue operations and service their customers.  I believe this disruption would adversely impact customer relationships resulting in a decline in the Debtors' revenues and profits as well as impact a sale of the Debtor's assets.  Such a result could jeopardize the value of creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.  Prior to the Commencement Date, the Utility Providers did not require, and the Debtors did not provide it with, a security deposit.

## C. Retention Applications

 i. The Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Richards Kibbe & Orbe LLP as Attorneys for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Commencement Date (the "***RK&O Retention Application***")

42.     The Debtors seek to retain Richards Kibbe & Orbe LLP ("RK&O") as their restructuring attorneys.  RK&O has extensive experience and knowledge in, and an excellent reputation for, providing high quality legal services in the field of creditor rights, and business reorganizations under chapter 11 of the Bankruptcy Code.  In preparing for the chapter 11 cases, RK&O has become familiar with the Debtors' business and the legal issues that may arise in these cases.  I believe that RK&O is well qualified and uniquely able to represent the Debtors in the chapter 11 cases and respectfully submit that the RK&O Retention Application should be approved.

ii.   The Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of BDO Capital Advisors, LLC as Investment Banker and Financial Advisor *Nunc Pro Tunc* to the Commencement Date (the "***BDO Capital Retention Application***")

43.     The Debtors seek to retain BDO Capital Advisors, LLC ("***BDO Capital***") as their investment banker and financial advisor.  BDO has extensive experience and knowledge in, and an excellent reputation for, providing investment banking and financial advisory services to troubled companies, including representing chapter 11 debtors and debtors in possession.  BDO Capital has done a significant amount of work in assisting the Debtors with identifying purchasers and negotiating with potential purchasers for the proposed sale of the Debtors' assets. In connection with these services, BDO Capital has become familiar with the Debtors' business and is in the best position to help the debtors wit the proposed sales and marketing process.  I believe that BDO Capital is well qualified and uniquely able to represent the Debtors in these chapter 11 cases and respectfully submit that the BDO Capital retention application should be approved.

**D.  Sale Motion**

i. Motion for (I) Order (A) Establishing Bidding Procedures Relating to Sale of All or Substantially All Assets of Certain of the Debtors, (B) Authorizing and Scheduling Date and Time for Auction, (C) Scheduling Date and Time for Hearing on Sale Order, (D) Approving Cure Amount Procedures, and (E) Setting Objection Deadlines and (II) Order Approving Sale of All or Substantially All Assets of Nutrition 21, Inc. and Nutrition 21, LLC (the "*Sale Motion*")

44.     As set forth above, prior to the Commencement Date, in consultation with BDO Capital, the Debtors, following a strategic review of their restructuring options, determined that it was in the best interests of the Debtors and their estates for Debtors Nutrition 21 and Nutrition 21, LLC to sell all or substantially all of their assets.

45.     Although there is currently no stalking horse bidder, as a result of the Debtors' and BDO Capital's extensive marketing efforts, the Debtors are confident that a highly competitive Auction can take place expeditiously and that the Auction and resulting Sale will be favorable to and in the best interests of the Debtors' estates.

46.     The Debtors are, however, requesting authority to enter into an agreement with a stalking horse bidder if the Debtors are able to reach an agreement with a third-party prior to the Auction and the Debtors believe that a stalking horse will maximize value.

47.     The proposed bidding procedures were developed following consultation with the Debtors' professionals.  The Debtors believe that the adoption of the bidding procedures will greatly facilitate the solicitation of bids for the assets and that the proposed bidding procedures constitute not only a reasonable, but effective method of maximizing a return on the assets to be sold though a competitive auction and sale process.

**Part V**

48.     Local Rule 1007-2 requires that certain information about the Debtors be provided in this declaration. This required information is provided in the schedules attached to

16

Exhibit A of this Declaration.  Specifically, the schedules attached to Exhibit A contain the

following information with respect to the Debtors:[4]

- Pursuant to Local Rule 1007-2(a)(4), Schedule 1 provides information with respect to the holders of the 20 largest unsecured claims against the Debtors on a consolidated basis.

- Pursuant to Local Rule 1007-2(a)(5), Schedule 2 provides information with respect to the holders of the five largest secured claims against the Debtors on a consolidated basis.

- Pursuant to Local Rule 1007-2(a)(6), Schedule 3 provides a summary of the Debtors' assets and liabilities on a consolidated basis.

- Pursuant to Local Rule 1007-2(a)(7), Schedule 4 provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Rule 1007-2(a)(8), Schedule 5 provides information on the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents or secured creditor or agent for any such entity.

- Pursuant to Local Rule 1007-2(a)(9), Schedule 6 provides information on the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

- Pursuant to Local Rule 1007-2(a)(10), Schedule 7 lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

- Pursuant to Local Rule 1007-2(a)(11), Schedule 8 lists the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

- Pursuant to Local Rule 1007-2(a)(12), *Schedule 9* provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

---

[4] The information contained in the schedules attached to Exhibit B of this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. Unless otherwise indicated, the financial information contained in the schedules is unaudited. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings ascribed to them in the preceding paragraphs of this Declaration.

Date:   August 26, 2011

/s/ Alan J. Kirschbaum
Alan J. Kirschbaum

**Exhibit A**

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## Southern District of New York

In re __Nutrition 21, Inc.__

Debtor(s)

Case No. _____

Chapter __11__

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1) Name of creditor and complete mailing address including zip code | (2) Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Alpha Jallow 14 S. Meadow Drive Danbury, CT 06811 | Alpha Jallow 14 S. Meadow Drive Danbury, CT 06811 | Employee wages and benefits | Contingent Unliquidated | 44,923.00 |
| Cassie Tillman-Randall 531 Upper Avenue Newburgh, NY 12550 | Cassie Tillman-Randall 531 Upper Avenue Newburgh, NY 12550 | Employee wages and benefits | Contingent Unliquidated | 20,408.00 |
| David Pagura 233 Woodland Avenue Yonkers, NY 10703 | David Pagura 233 Woodland Avenue Yonkers, NY 10703 | Employee wages and benefits | Contingent Unliquidated | 34,892.00 |
| Gail Kraljevic 76 Mt. Holly Rd Katonah, NY 10536 | Gail Kraljevic 76 Mt. Holly Rd Katonah, NY 10536 | Employee wages and benefits | Contingent Unliquidated | 19,286.00 |
| James Komorowski 83 Bunker Hill Drive Trumbull, CT 06611 | Jim Komorowski 83 Bunker Hill Drive Trumbull, CT 06611 | Employee wages and benefits | Contingent Unliquidated | 98,245.00 |
| Joanne Goldstein 8 Leisure Farm Drive Armonk, NY 10504 | Joanne Goldstein 8 Leisure Farm Drive Armonk, NY 10504 | Employee wages and benefits | Contingent Unliquidated | 3,150.00 |
| Kate Wallour 754 Bronx River Road Apt B23 Bronxville, NY 10708 | Kate Wallour 754 Bronx River Road Apt B23 Bronxville, NY 10708 | Employee wages and benefits | Contingent Unliquidated | 8,562.00 |
| Nutrition 21, LLC 4 Manhattanville Road Purchase, NY 10577 | Nutrition 21, LLC 4 Manhattanville Road Purchase, NY 10577 | Intercompany receivable | | 109,736,000.00 |
| Steven Sundell 12 Winter Ridge Road Newtown, CT 06470 | Steven Sundell 12 Winter Ridge Road Newtown, CT 06470 | Employee wages and benefits | Contingent Unliquidated | 58,295.00 |
| Ultimate Formulations Inc dba Best Formulations | Ultimate Formulations Inc dba Best Formulations | Legal dispute | Contingent Unliquidated Disputed | 126,184.12 |
| US Customs and Borders Protect 6550 Telecome Drive Indianapolis, IN 46278 | US Customs and Borders Protect 6550 Telecome Drive Indianapolis, IN 46278 | Legal dispute | Contingent Unliquidated Disputed | 30,949.29 |

**B4 (Official Form 4) (12/07) - Cont.**

In re __Nutrition 21, Inc.__                                           Case No. _____

_____
Debtor(s)

# LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
## (Continuation Sheet)

| (1)<br><br>_Name of creditor and complete mailing address including zip code_ | (2)<br><br>_Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted_ | (3)<br><br>_Nature of claim (trade debt, bank loan, government contract, etc.)_ | (4)<br><br>_Indicate if claim is contingent, unliquidated, disputed, or subject to setoff_ | (5)<br><br>_Amount of claim [if secured, also state value of security]_ |
|---|---|---|---|---|
| **Walgreen Co. Inc.**<br>**200 Wilmont Road**<br>**Deerfield, IL 60015** | **Walgreen Co. Inc.**<br>**200 Wilmont Road**<br>**Deerfield, IL 60015** | **Legal dispute** | **Contingent**<br>**Unliquidated**<br>**Disputed** | **1,600,000.00** |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the Chief Financial Officer of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date _____           Signature _____

**Alan Kirschbaum**
**Chief Financial Officer**

_Penalty for making a false statement or concealing property_:  Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## Southern District of New York

In re    __Nutrition 21, LLC__                       Case No. _____

                                             Debtor(s)      Chapter     __11__

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

      Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [*or* chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian."  Do not disclose the child's name.  See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| **James Kahn**<br>**27A Putnam Green**<br>**Greenwich, CT 06830** | **J. Kahn**<br>**27A Putnam Green**<br>**Greenwich, CT 06830** | **Employee Wages and Benefits** | **Contingent**<br>**Unliquidated** | **39,200.00** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**B4 (Official Form 4) (12/07) - Cont.**

In re    **Nutrition 21, LLC**                    Case No. _____

                            Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| (1) <br><br> *Name of creditor and complete mailing address including zip code* | (2) <br><br> *Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3) <br><br> *Nature of claim (trade debt, bank loan, government contract, etc.)* | (4) <br><br> *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5) <br><br> *Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

       I, the Chief Financial Officer of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date _____        Signature _____

                                        **Alan Kirschbaum**
                                        **Chief Financial Officer**

      *Penalty for making a false statement or concealing property*:  Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§  152 and 3571.

<u>Schedule 1</u>

**Consolidated List of the Holders of the 20 Largest Unsecured Claims Against the Debtors**

<u>Schedule 2</u>

**Consolidated List of Holders of 5 Largest Secured Claims**

Not applicable.

<u>Schedule 3</u>

**Condensed Consolidated Balance Sheet**

The following financial data (unaudited and subject to change) is the latest available information and reflects the Debtors' financial condition, as consolidated as of June 30, 2011.

The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value): $3,462,000

Total GAAP Liabilities: $18,066,000

<u>Schedule 4</u>

**Publicly Held Securities**

Pursuant to Local Rule 1007-2(a)(7), the following table sets forth, as of June 30, 2011, the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held ("***Securities***") and the number of holders thereof.

| Type and Class of Security | Number of Securities | Number of Holders |
|---|---|---|
| Common shares | 192,936,779 | 379 |

<u>Schedule 5</u>

**Debtors' Property Not in the Debtors' Possession**

None.

<u>Schedule 6</u>

**Owned or Leased Premises**

Debtor Nutrition 21 leases the Debtors' headquarters at 4 Manhattanville Road, Purchase, New York 10577.

<u>Schedule 7</u>

**Location of Debtors' Substantial Assets, Books and Record and Non-United States Assets**

The Debtors' substantial assets and there books and records are located at their corporate headquarters: 4 Manhattanville Road, Purchase, New York 10577.  The Debtors have no assets located outside of the United States.

<u>Schedule 8</u>

**Summary of Legal Actions Against the Debtor**

**Breach of contract suit commenced by Walgreen Co., Inc. v. Nutrition 21, INC. et al., Case No. 1:11-CV-03493, (N.D. Ill. 2011).  Walgreen seeking approximately $1,600,000 in damages.**

**Senior Management**


*Mr. Michael Zeher, President and Chief Executive Officer*
Mr. Zeher joined Nutrition 21 in 2008 as President and Chief Executive Officer and brings with him extensive leadership in the consumer healthcare markets as well as turnaround experience. Prior to joining Nutrition 21, he held Chief Executive Officer positions at other leading supplement and pharmaceutical-OTC companies including Nutritional Laboratories International, Inc., a privately-held contract manufacturer and marketer of dietary supplements; Pharmaceutical Formulations, Inc., a manufacturer of over 100 different types of solid-dose over-the-counter pharmaceutical products; and Lander Company, Inc., a global manufacturer and marketer of health and beauty care products.  Prior to that, he served as Vice President, Business Development for Johnson & Johnson, where he was responsible for the North American Consumer Sector business. Currently and for the last 10 years, Mr. Zeher has been a member of the Board of Directors of Matrixx Initiatives, Inc., a NASDAQ pubic company that markets consumer health products primarily through the mass market channels. He also serves on the Board of Directors of two Washington, DC based trade associations comprised of the leading marketers and manufacturers in the consumer healthcare industry: the Council for Responsible Nutrition (CRN) and the Consumer Healthcare Products Association (CHPA). Mr. Zeher holds a B.S. in Business Administration from Old Dominion University.


*Mr. Alan Kirschbaum, Chief Financial Officer, VP Finance & Treasury*
Mr. Kirschbaum was appointed as Chief Financial Officer on May 26, 2006. From July 2002 to April 2006, he was Vice President, Finance and Treasury, and Principal Accounting Officer. From December 1998 to June 2002 he served Nutrition 21 as Controller. Prior to joining Nutrition 21, Mr. Kirschbaum was Vice President and Controller of AMS Asset Management Services.  From 1984 to 1996, he held a series of increasingly responsible financial positions with Ascom Timeplex, Inc.  He is a CPA, and Kirschbaum holds a B.S. from Pennsylvania State University, and an MBA from Pace University.

*Benjamin T. Sporn*, Vice President, General Counsel and Secretary
Mr. Sporn has been legal counsel to Nutrition 21 since 1990, and has served as Secretary of the Nutrition 21 since 1986, and was appointed an officer and General Counsel in February 1998. Mr. Sporn was a director of Nutrition 21 from 1986 until 1994.  Prior to joining Nutrition 21, Mr. Sporn was an attorney with AT&T from 1964 until December 1989 when he retired from AT&T as a General Attorney for Intellectual Property Matters.  He received a BSE degree from Rensselaer Polytechnic Institute and a J.D. degree from American University.

*William Levi*, Vice President of Operations and Business Development, Nutrition 21, LLC
Mr. Levi has served as Vice President of Operations and Business Development since May, 2006.  He has been instrumental in developing new markets, including Functional Foods,