**Marc A. Lieberman, Esq.**
**Alan W. Forsley, Esq.**
**FREDMAN KNUPFER LIEBERMAN LLP**
1875 Century Park East, Suite 2200
Los Angeles, CA 90067
Telephone:   (310) 284-7350
Facsimile:    (310) 284-7352

**Lawrence D. Bernfeld Esq.**
**Joseph H. Lessem, Esq.**
**GRAUBARD MILLER**
The Chrysler Building
405 Lexington Avenue, 19th Floor
New York, NY 10174-1901
Telephone:   (212) 818-8607
Facsimile:    (212) 818-8881

Counsel for Creditors Probiohealth, LLC and Probioferm, LLC

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| NUTRITION 21, INC., | ) |
| | ) Case No. 11-23712 (RDD) |
| | ) |
| Debtors. | ) Jointly Administered |

## CONDITIONAL OBJECTION TO (1) DEBTORS' ABILITY TO ASSUME AND ASSIGN ITS AGREEMENT WITH PROBIOHEALTH, LLC AND PROBIOFERM, LLC, AND (2) DEBTORS' PROPOSED CURE AMOUNT[1]

1.      On September 22, 2011, this Court entered an Order setting October 28,

2011 as the last date to file responses or objections to the ability of the Debtors to assume

and assign to a successful bidder a license and supply agreement (defined herein) that

certain Debtors entered into with creditors Probiohealth, LLC and Probioferm, LLC

---

[1] There are four Debtors in these Chapter 11 cases. Along with the last four digits of each Debtor's federal tax identification number, the four Debtors are: Nutrition 21, Inc. (3613), Nutrition 21, LLC (4596), Iceland Health, LLC (2140) and Heart's Content, Inc. (5396) (collectively **"Debtors"**). The location of Debtors' corporate headquarters is 4 Manhattanville Road, Purchase, New York 10577.

(collectively "**Probio**").[2] The Court also set October 28 as the last date to file responses or objections to Debtors' proposed cure amounts.

2.     As shown more fully herein, Probio and Nutrition 21, Inc. entered into a license and supply agreement. As a condition of maintaining the agreement, Debtor was required to conduct a clinical study. Pre-petition, Debtor failed to conduct the study. Debtor's failure to do so constituted a material breach of its obligations under the agreement.

3.     Although Probio has the right to pursue full relief permitting termination of the license[3], at this time Probio files only a conditional objection to Debtors' request to assume and assign the August 6, 2009 License and Supply Agreement between Probio and Debtor Nutrition 21, Inc. (the "**Agreement**"). The conditions of Probio's objection are recited herein.

4.     Debtor claims it is in the process of curing its pre-petition default, yet it has offered no evidence to demonstrate it has done so. Debtor also has failed to show that the default promptly can be or will be cured.[4] For such reasons, the Court should deny Debtor's request to assume and assign the Agreement unless or until Debtor proves the default has been cured by performing the contractually required clinical study, or that it has the ability to effect a cure and promptly does so.

5.     Debtors, on August 31, 2011, filed a motion to obtain an order to establish bidding procedures, etc. relating, *inter alia*, to the sale of all or substantially all of the assets of certain Debtors (the "**August 31, 2011 Sale Motion**").[5] Debtors' motion recites

---

[2] The September 22, 2011 Order, more specifically, is one (A) Establishing Bidding Procedures Relating to Sale of All or Substantially All Nutrition 21, Inc. and Nutrition, 21, LLC Assets, (B) Authorizing and Scheduling Date and Time to Hold Auction, (C) Scheduling Date and Time for Hearing on August 31, 2011 Sale Motion, (D) Approving Cure Amount Procedures, and (E) Setting Objection Deadlines.

[3] Subject to obtaining relief from the automatic stay.

[4] At this time, Probio only objects to assumption of the Agreement because that is at issue. Probio will file its objections, if any, regarding adequate assurances of assignment when the Court sets a hearing.

[5] The Order requested pursuant to the August 31, 2011 Sale Motion more specifically would be an (I) Order (A) Establishing Bidding Procedures Relating to Sale of All or Substantially All Assets of Certain of the Debtors, (B)

that any order approving the Sale should include "findings limiting the purchaser's successor liability." Such vague and ambiguous language fails to provide Probio with information sufficient for Probio to determine what Debtor means by "limiting the purchaser's successor liability." Accordingly, Probio respectfully asks the Court to deny Debtor's request to assume and assign until Debtor provides Probio with information sufficient for Probio to respond, and for the Court to consider Probio's response.

## Background

6.      On August 6, 2009, Probio and Debtor Nutrition 21 entered into an Agreement granting Nutrition 21 a license to import, manufacture, market, and distribute nutritional supplement products consisting of combinations of fish oil with microorganics known as probiotics (collectively the "**Products**").[6]

7.      Under the Agreement, Probiohealth, LLC is the licensor ("**Licensor**") and Probioferm, LLC is the supplier ("**Supplier**"). (Agreement Section 2.1). Attached to the accompanying Declaration of Yoshi Koide as Exhibit "A" is a true and exact copy of the Agreement.

8.      Subject to Debtor's performance of certain conditions identified in Amendment No. 2 (discussed more fully herein), the Agreement grants Nutrition 21 an exclusive license to market and sell the Products, together with a license to use Licensor's KE-01 and KE-99 patents in the U.S., Canada and certain other territories (the "**Patents**"). (Agreement Section 2.1).[7]

---

Authorizing and Scheduling Date and Time for Auction, (C) Scheduling Date and Time for Hearing on Sale Order, (D) Approving Cure Amount Procedures, and (E) Setting Objection Deadlines and (II) Order Approving Sale of All or Substantial all Assets of Nutrition21, Inc. and Nutrition 21, LLC.

[6] Probiotics are live microorganisms thought to be beneficial to a host organism.

[7] Debtor's Schedule B, number 23, lists the Patent Licenses as having not[?] value. Attached as Exhibit "A" to the Request for Judicial Notice ("RJN") is a copy of Debtor's Schedule B.

3

9.     Section 10.1 of the Agreement provides that, should either party give at least six months' prior written notice of termination, the Agreement expires on August 5, 2012.  Under the Bankruptcy Law, if Debtor has not cured all of the defaults or if other sufficient reasons exist to terminate the Agreement, Probio may seek relief from the automatic stay to permit Probio to give notice of Probio's election to terminate the Agreement.

10.    Section 11.11 recites that the Agreement is governed by New York law.

11.    On January 31, 2011, the parties entered into Amendment No. 2 to the Agreement ("**Amendment No. 2**").  Attached to the Koide Declaration as Exhibit "B" is a true and exact copy of Amendment No. 2.

12.    Pursuant to Amendment No. 2, Debtor Nutrition 21, Inc. agreed it would:

> <u>Conduct a minimum of one (1) human clinical study to be completed no later than June 30, 2011</u>.  The study will be designed as a double-blind placebo-controlled study and will be of a quality to qualify for peer-review publishing.  Licensor will be given the opportunity to make recommendations on the study protocol.  The Parties may choose to collaborate on additional clinical studies to establish superior efficacy and specific health-related outcomes.

(the "**Clinical Study**"; emphasis added).

13.    The Agreement requires that the Clinical Study be performed by professionals having the necessary training and experience to permit the study to qualify for peer-review publishing.  (Koide Decl. ¶ 6 [Amendment No. 2, ¶ 2.7]).  Debtor Nutrition 21, Inc. did not timely complete the Clinical Study and thereafter did not do so within a 90-day cure period following notice of default that Probio gave pursuant to the Agreement.  (Koide Decl. ¶ 6).  Accordingly, Debtor, pre-petition, defaulted under the Agreement

14.    Debtors filed the August 31, 2011 Sale Motion seeking an order to establish bidding procedures, etc. relating, *inter alia*, to the sale of all or substantially all of the assets of certain Debtors.  A copy of the August 31, 2011 Sale Motion and the proposed

Sale Agreement made a part of such motion are attached as Exhibit "C" to the Koide Declaration.

15.     The August 31, 2011 Sale Motion recites: "Debtors anticipate that the purchaser will require that the Sale Order include <u>findings limiting the purchaser's liability</u>." (Emphasis added.) August 31, 2011 Sale Motion, ¶ 16(e). The Motion further recites Debtors' intent to assign, sell, and transfer to a successful bidder all of their assets pursuant to a sale agreement. As shown herein, Probio objects to Debtors' vague and ambiguous request that the Sale Order "include findings limiting the purchaser's successor liability."

**Relief Requested**

**A.     The Court Should Deny Debtor's Request to Assume the Agreement Because Debtor Has Provided No Evidence That It Has Cured, or Has the Ability to Cure and Promptly Will Cure, Its Default in Failing to Conduct the Required Clinical Trial**

16.     "When there has been a default in an executory contract, a debtor in possession must comply with three requirements before the contract can be assumed:

    (i)     Cure any outstanding default or provide adequate assurance that the default will be promptly cured;

    (ii)    Compensate the counterparties to the contract for any pecuniary loss or provide adequate assurance of compensation; and

    (iii)   Provide adequate assurance of future performance under the contract.

<u>In re Empire Equities Capital Corp.</u> 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009).

17.     The default cure requirement exists "'to insure that the contracting parties receive the full benefit of their bargain if they are forced to continue performance.'" <u>In re Escarent Entities, L.P.</u> 423 Fed. Appx. 462, 465 (5th Cir. 2011).

18.     In 2005, Congress revised the language of 11 U.S.C. § 365(b)(2)(D) "making it clear that most non-monetary defaults are not exempted from the cure

5

requirements." In re Empire Equities Capital Corp. 405 B.R. at 690. In particular, non-monetary defaults in non-lease executory contracts are not exempt from the cure obligation. Id. at 691.

19.     Debtor may not assume the Agreement until it "'cures, or provides adequate assurance that [it] will promptly cure, such default.' 11 U.S.C. § 365(b)(a)(A)." In re Offices & Services of White Plains Plaza, Inc., 58 B.R. 441, 443 (Bankr. S.D.N.Y. 1986).

20.     Debtor has offered no evidence to show it is in the process of completing the required Clinical Study, or that it is capable of completing and promptly will complete the Clinical Study in accordance with the terms of the Agreement. Debtor also has not provided evidence that the Study "will be of a quality to qualify for peer-review publishing." Amendment No. 2, ¶ 2.7. This Court, therefore, should deny Debtor's request to assume the Agreement until such time, if any, as Debtor provides sufficient evidence to satisfy Probio that Debtor has cured or is capable of curing and promptly will cure the default.

**B.      The Court Should Deny Debtor's Request to Assume the Agreement Because the August 31, 2011 Sale Motion Is Vague and Ambiguous Regarding a Proposed Limitation on a Prospective Purchaser's Successor Liability**

21.     The August 31, 2011 Sale Motion asks that any order of sale "include findings limiting the purchaser's successor liability" under the Agreement. August 31, 2011 Sale Motion, ¶ 16(e). The requested language is vague, ambiguous, and fails to provide Probio with sufficient information to respond. Accordingly, the Court should deny Debtor's request to assume and assign until Debtor provides Probio with information regarding the requested relief in form and substance sufficient to permit Probio to respond.

## Conclusion

22.    Based upon the foregoing, Probio respectfully asks the Court to deny Debtor's request to assume the Agreement unless or until:

    (a)    Debtor proves that its default has been cured, or that Debtor has the ability to cure and promptly will cure the default; and

    (b)    Debtor provides Probio with information regarding the request for an order restraining and limiting a potential purchaser's liability in form and substance sufficient to permit Probio to understand and respond to the request.

Probio also respectfully asks the Court to give Probio sufficient time to respond after Debtor has clarified its vague and ambiguous request. Finally, Probio asks the Court to grant to Probio such other and further relief as the Court may deem just and proper.

DATED: October 28, 2011

FREDMAN KNUPFER LIEBERMAN LLP

By:   /s/ Marc A. Lieberman
       Marc A. Lieberman, Esq.
       Alan W. Forsley, Esq.
    1875 Century Park East, Suite 2200
    Los Angeles, California 90067-2523
    Tel.: (310) 284-7350

    GRAUBARD MILLER
    Lawrence D. Bernfeld, Esq.
    Joseph H. Lessem, Esq.
    405 Lexington Avenue, 19th Floor
    New York, New York 10174-1901
    Tel.: (212) 818-8800

    *Attorneys for Probiohealth, LLC*
      *and Probioferm, LLC*

# DECLARATION OF YOSHI KOIDE

Yoshi Koide, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the managing member of Probiohealth, LLC and Probioferm, LLC.

2.      On August 6, 2009, on behalf of Probiohealth, LLC ("**Licensor**") and Probioferm, LLC ("**Supplier**") I entered into a License and Supply Agreement (the "Agreement") with Nutrition 21, LLC ("**Debtor**").  Pursuant to the Agreement, Licensor and Supplier granted Debtor a license to import, manufacture, market, and distribute nutritional supplement products consisting of combinations of fish oil with probiotics (collectively the "**Products**").  Attached as Exhibit "A" is a true and exact copy of the Agreement.

3.      The Agreement provides Debtor for a period of time with an exclusive license to market and sell the Products and to use Licensor's KE-01 and KE-99 patents (the "**Patents**") in the U.S., Canada and other territories.

4.      On January 31, 2011, the Parties entered into Amendment No. 2 to the Agreement ("**Amendment No. 2**").  Attached as Exhibit "B" is a true and exact copy of Amendment No. 2.

5.      In Amendment No. 2, Debtor agreed that it would:

> Conduct a minimum of one (1) human clinical study to be completed no later than June 30, 2011.  The study will be designed as a double-blind placebo-controlled study and will be of a quality to qualify for peer-review publishing. Licensor will be given the opportunity to make recommendations on the study protocol.  The Parties may choose to collaborate on additional clinical studies to establish superior efficacy and specific health-related outcomes.

(the "**Clinical Study**"; emphasis added).

6.      Debtor has defaulted under the Agreement because it did not timely complete the Clinical Study and did not complete it within the 90 day cure period provided in the Agreement following notice of default.  The Clinical Study must be

performed by professionals with the necessary training and experience to have the study qualify for peer-review publishing.

7.     On August 31, 2011, Debtors filed a motion to obtain an order to establish bidding procedures, etc. (the "**August 31, 2011 Sale Motion**"). A copy of the August 31, 2011 Sale Motion and a proposed Sale Agreement which is part of the motion are attached as Exhibit "C."

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Beverly Hills, California, on October 28, 2011.

_/s/ Yoshi Koide_
YOSHI KOIDE

# EXHIBIT "A"

# LICENSE AND SUPPLY AGREEMENT

by and among

## PROBIOHEALTH, LLC,

## PROBIOFERM, LLC

and

## NUTRITION 21, INC.

dated

August 6, 2009

# TABLE OF CONTENTS

Article I.     Definitions ..................................................................................

Article II.    Licensing, Manufacture and Supply of Product ........................................

Article III.   Warranties ..................................................................................

Article IV.   Further Obligations of the Parties ..................................................

Article V.    Insurance ..................................................................................

Article VI.   Representations and Warranties...................................................

Article VII.  Intellectual Property..................................................................

Article VIII. Indemnification ..........................................................................

Article IX.   Confidentiality and Public Disclosure ........................................

Article X.    Term and Termination ................................................................

Article XI.   Miscellaneous ..........................................................................

Exhibit A.   Product Description, Specifications ..............................................

Schedule A Licensed Patents

**LICENSE AND SUPPLY AGREEMENT** (the "Agreement"), dated as of August 6, 2009 (the "Effective Date"), by and among Probiohealth, LLC, a limited liability corporation organized under the laws of California, with offices at 9595 Wilshire Blvd., Suite 810 Beverly Hills, California 90212 ("Licensor"), Probioferm, LLC, a limited liability corporation organized under the laws of Iowa, with offices at 10215 Dennis Dr. Urbandale, Iowa 50322 ("Supplier"), and Nutrition 21, Inc., a New York corporation with offices at 4 Manhattanville Road, Suite 202, Purchase, New York 10557 ("Company").

RECITALS

A. Licensor owns certain intellectual property, including patents, patent applications, know-how and technology, relating to probiotics, and combination products of probiotics and oil for administration to humans and animals.

B. Supplier is engaged in, among other things, the development, manufacture, distribution and sale of probiotics as ingredients in products for administration to humans and animals. Supplier is an Affiliate (as defined below) of Licensor, and Supplier manufactures and sells its products under certain patents held by Licensor.

C. Company is engaged in, among other things, the development, manufacture, distribution and sale of nutritional supplement products for administration to humans and animals.

D. Supplier, Licensor and Company desire to enter into this Agreement pursuant to which (i) Licensor will license to Company certain of its intellectual property rights relating to combination products of probiotics and oil; (ii) Supplier will manufacture and supply to Company probiotics for use by Company in certain of its nutritional supplement products; and (iii) Company will source such probiotics from Supplier.

NOW, THEREFORE, in consideration of the foregoing premises, and the mutual covenants and obligations set forth herein, Licensor, Supplier and Company hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

As used in this Agreement, the following definitions shall apply:

1.1 ""Act" shall mean the US Federal Food, Drug and Cosmetic Act of 1934, and the regulations promulgated thereunder, as the same may be amended from time to time.

1.2 "Affiliate" shall mean, with respect to Party, any person or entity which, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Party. A person or entity shall be deemed to control a corporation (or other entity) if such person or entity possesses, directly or indirectly, more than fifty percent (50%) of the outstanding voting securities or other equity or voting interest of such corporation (or other entity).

2

1.3    "Applicable Law" shall mean all applicable laws, rules, regulations and guidelines (including any amendments, extensions or replacements thereto) of a Governmental Body, including, without limitation, GMPs and the Act.

1.4    "Licensor Intellectual Property" shall mean all patents and patent applications listed on Schedule A to this Agreement; trademarks; service marks; trade names; trade dress; copyright; trade secrets; proprietary know-how; discovery, development or invention; scientific and medical information; technical data; technology, techniques and methods, owned by or licensed to Licensor or its Affiliates, relating to combinations of fish oil and probiotics for administration to humans or animals in the Territory. Licensor agrees to grant Company a first right of refusal to license any inventions or developments made or acquired by Licensor after the execution of this Agreement related to combinations of fish oil and probiotics for administration to humans or animals in the Territory. Any such license shall be offered to Company on commercially reasonable terms.

1.5    "Confidential Information" shall mean, with respect to a Party, all information of any kind whatsoever (including without limitation, data, compilations, formulae, financial models, patent disclosures, procedures, processes, projections, forecasts, protocols, results of experimentation and testing, specifications, strategies and techniques), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, apparatus, compositions, documents, drawings, machinery, patent applications, records and reports), which is disclosed by such Party to the other Party. Notwithstanding the foregoing, Confidential Information of a Party shall not include information which the other Party can establish by written documentation (a) to have been publicly known prior to disclosure of such information by the disclosing Party to the other Party, (b) to have become publicly known, without fault on the part of the other Party, subsequent to disclosure of such information by the disclosing Party to the other Party, (c) to have been received by the other Party at any time from a source, other than the disclosing Party, rightfully having possession of and the right to disclose such information, (d) to have been otherwise known by the other Party prior to disclosure of such information by the disclosing Party to the other Party, or (e) to have been independently developed by employees or agents of the other Party without the use of such information disclosed by the disclosing Party to the other Party.

1.6    "FDA" shall mean the United States Food and Drug Administration, and any successor agency thereto.

1.7    "GMP" shall mean, current Good Manufacturing Practices, as such term is used in the Act, or such similar terms as used under Applicable Law in any country within the Territory.

1.8    "Governmental Body" shall mean any nation or government, any state, province, or other political subdivision thereof, or any entity with legal authority to exercise executive, legislative, judicial, regulatory, or administrative functions or pertaining to government in the Territory, including, without limitation, the FDA.

1.9 "Label", "Labeled" or "Labeling" shall mean all labels and other written, printed or graphic matter upon (i) the Product or any container or wrapper utilized with the Product, and/or (ii) any written material accompanying the Product, including, without limitation, package inserts.

1.10 "Latent Defect" shall mean any instance where a Product fails to conform to the applicable Product Specifications, and such failure would not be discoverable upon physical inspection or testing of such Product.

1.11 "Licensed Product" shall have the meaning defined in Section 2.1.

1.12 "Packaging" shall mean all primary containers, including cartons, shipping cases or any other like matter used in packaging or accompanying the Product.

1.13 "Party" shall mean each of Licensor, Supplier or Company, as the case may be.

1.14 "Patent Defect" shall mean any instance where a Product fails to conform to the applicable Product Specifications, and such failure is discoverable upon reasonable physical inspection or testing of such Product upon receipt by Company.

1.15 "Person" shall mean an individual, corporation, partnership, Limited Liability Company, trust, business trust, association, Joint Stock Company, joint venture, pool, syndicate, sole proprietorship, unincorporated organization, governmental authority or any other form of entity not specifically listed herein.

1.16 "Product" shall mean Supplier's probiotics, including, but not limited to, a proprietary probiotic strain covered by ATCC accession number PTA 3925, currently designated by Licensor and Supplier as "KE-01" and "KE-99", as described in Exhibit A.

1.17 "Product Specifications" shall mean the specifications for the Product, attached hereto as Exhibit A, as such may be revised from time to time in accordance with the terms of this Agreement by written agreement executed by Supplier and Company.

1.18 "Purchase Price" shall mean the price per kilogram paid to Supplier for Product, as set forth Section 2.5.

1.19 "Regulatory Application" shall mean any regulatory application or any other application for marketing approval for the Product, in the Territory, including any supplements or amendments thereto.

1.20 "Term" shall have the meaning set forth in Section 10.1 hereto.

1.21 "Territory" shall mean (i) the United States of America, its territories and possessions, (ii) Canada, and (iii) all other territories in which Licensor has (or during the Term obtains) patents covering Licensed Products.

1.22 "<u>Third Party</u>" shall mean any party other than Company, Supplier, and their respective Affiliates.

1.23 "<u>Trademark</u>" shall have the meaning set forth in Section 2.2.

## ARTICLE II

## <u>LICENSING, MANUFACTURE AND SUPPLY OF PRODUCT</u>

2.1 <u>License Grant</u>. Licensor hereby grants to Company an exclusive (subject to Section 2.5.3 hereof) license under Licensor's patent(s), including the patent listed on Schedule A hereto and patent(s) issuing on the patent application listed on Schedule A hereto, to import, manufacture, use, distribute and market in the Territory nutritional supplement products consisting of combinations of fish oil with one or more Products for human administration or animal administration (each, a "Licensed Product"). Notwithstanding anything to the contrary contained herein, Supplier retains the exclusive right to market, sell and distribute probiotics in the Territory for use other than with fish oils.

2.2 <u>Use of Trademarks; Covenant Not To Sue</u>. Company may market, and sell the Licensed Products under any of Company's trademark or trademarks as it may from time to time choose, and the license granted in Section 2.1 includes the right, in Company's sole discretion, to use at all times, or from time to time, in Company's packaging, labeling, marketing or otherwise in promoting the Licensed Products, Licensor's or Supplier's "KE-99" and "KE-01" marks (each, a "Trademark"). Such Trademarks shall remain the sole property of Licensor and Supplier. In addition, in connection with Supplier's supplying Product to Company and Company's manufacture, sale and distribution of Licensed Products, Licensor and Supplier and their respective Affiliates hereby covenant and agree not to sue under any patents relating to probiotics.

2.3 <u>Supply of Product by Supplier</u>. Supplier shall use reasonable commercial efforts to manufacture and supply such quantities of the Product from its facility to Company, as Company shall order pursuant to Section 3.5.3 hereof. All Product supplied by Supplier shall be packaged, labeled, stored and transported in accordance with all Applicable Laws. Supplier shall sell to Company, on an exclusive basis in the Territory and during the Term, Product for use in combination with any fish oil.

The Parties will also discuss and negotiate in good faith appointing Company as exclusive distributor of the Product for the United States market.

2.4 <u>Forecasts and Orders</u>.

2.4.1 <u>Forecasts</u>. Not less than ten (10) days prior to the first day of each calendar quarter, Company shall prepare and provide Supplier with a written forecast of the estimated Product requirements of Company for each of the following twelve (12) months. Such forecasts shall be non-binding, and are provided solely to assist Supplier in its Product production planning.

2.4.2 <u>Supply Obligation</u>.

2.4.2.1 Supplier agrees to supply the Product exclusively to Company during the Term for use in Licensed Products in the Territory, subject to the provisions set forth herein, and Company shall purchase exclusively from Supplier all of its requirements of Product covered by Licensor's patents for use in Licensed Products in the Territory, all on terms contained in this Agreement.

2.4.2.2 If Supplier is unable to meet any Company order for any continuous sixty (60) day period, Supplier shall give Company written notice describing such circumstances and detailing the extent to which it will not meet such requirements, together with a proposed course of action to remedy such failure. In such event Company may, in its discretion, cancel such portion of the order and/or meet such shortfall from any alternate source or sources selected by Company. Any procurement by Company from such alternative sources shall be limited to the extent of the shortfall by Supplier and such procurement will immediately cease as soon as Supplier is able to resume normal supplies, subject to depletion of any inventory on hand that was purchased or is to be delivered pursuant to binding contractual commitments to purchase such Product from the alternate source or sources. Company shall not enter into any long term supply commitments with any third party source. In order to facilitate Company's ability to purchase any shortfall from an alternate source, within the six-month period following execution of this Agreement Supplier will work diligently with Company to identify a potential alternate source, and during such six-month period Supplier will take such steps to reasonably enable such alternate source to produce Product in the event of a shortfall; provided, however, that Supplier shall not be obligated to disclose to such alternate source Supplier's proprietary formulation, fermentation, separation, freeze drying or encapsulation techniques until such time as a shortfall (or potential shortfall) exists.

2.4.3 <u>Orders</u>.

2.4.3.1 Company shall make all purchases hereunder by submitting firm purchase orders to Supplier. Each such purchase order shall specify the description of the Product ordered, the quantity ordered, the place of delivery and the required delivery date therefore, which shall not be less than [eight full weeks] "lead time" prior to the delivery dates.

2.4.3.2 Within ten (10) days of the receipt of each such order, Supplier shall notify Company of its acceptance of such purchase order as a binding order or shall indicate what portion of the amounts covered by the purchase order Supplier is willing to accept as a binding order. Supplier's acceptance of any purchase order is limited to the terms and conditions stated in this Agreement. In the event of a conflict between the terms and conditions of any purchase order and this Agreement, the terms and conditions of this Agreement

shall prevail. No purported oral or verbal agreement or other understanding which attempts in any way to modify the conditions stated herein will be binding, unless both parties agree to the modification, in advance and in writing

2.5    Minimum Purchases:

2.5.1    During the six-month period following the Effective Date, Company shall use commercially reasonable efforts to formulate a stable, commercially viable Licensed Product, and to elicit from its customer base interest in offering such Licensed Product. Notwithstanding anything to the contrary contained herein, Company makes no representation or warranty that it will be successful in producing a commercially viable Licensed Product, or in creating customer interest in any Licensed Product.

2.5.2    All Prices are F.O.B. Supplier's facility in Des Moines, Iowa, on payment terms net thirty (30) days. Supplier will supply Product to Company as follows:
(i) During the first six months of the Term, Company will target to purchase a minimum of thirty (30) kilograms of Product at a purchase price of $1,200 per kilogram.

(ii) During months seven through twelve of the Term, Company will target to purchase a minimum of sixty (60)]kilograms of Product as a purchase price of $1,200 per kilogram. Any Product purchases in excess of ninety (90) kilograms during the first twelve months of the Term will be at $1,000 per kilogram.

(iii) During months thirteen through eighteen of the Term, Company will target to purchase a minimum of ninety (90) kilograms of Product at a purchase price of $1,000 per kilogram.

(iv) During months nineteen through twenty four of the Term, Company will target to purchase a minimum of ninety (90) kilograms of Product as a purchase price of $1,000 per kilogram. Any Product purchases in excess of one hundred eighty (180) kilograms during months thirteen through twenty four of the Term will be at $900 per kilogram.

(v) During months twenty four through thirty six of the Term, Company will target to purchase a minimum of one hundred eighty (180) kilograms of Product as a purchase price of $1,000 per kilogram. Any Product purchases in excess of one hundred eighty (180) kilograms during months twenty four through thirty six of the Term will be at $900 per kilogram.

(v) For all periods after month thirty six of the Term, the purchase price of the Product will be $900 per kilogram.

Supplier shall invoice Company for the purchase price of Product not earlier than upon shipment to Company.

2.5.3    If at the end of any period described in Section 2.5.2 above the accrued quantities of the Product purchased by Company during the period are less than the minimum quantities outlined, Supplier may elect to convert the supply arrangement to a non-exclusive arrangement, and Licensor may elect to convert the licensed granted to Company under Section 2.1 to a non-exclusive license. For purposes of determining whether Company has purchased the minimum quantities, Company purchases of Product in excess of the minimum

quantities for a stated period shall be credited against minimum purchase quantities targets for the immediately following period.

### 2.6    Delivery and Acceptance.

2.6.1    Delivery. All Product supplied under this Agreement shall be shipped F.O.B. Supplier's facility in Des Moines, Iowa to such location as designated by Company in the applicable purchase order. Title and risk of loss and damages to Product purchased by Company hereunder shall pass to Company upon delivery to Company's designated carrier. Each shipment shall include a certificate of analysis for the Product included in the shipment.

2.6.2    Rejection. If a shipment of Product fails to conform to the Product Specifications, then Company shall have the right to reject such nonconforming shipment of Product or the nonconforming portion thereof, as the case may be in accordance with the following:

2.6.3    Patent Defect. Company shall give written notice to Supplier of its rejection hereunder, within sixty (60) days after Company's receipt of shipment of any Product containing a Patent Defect, specifying the grounds for such rejection. After receipt of such notice from Company, Supplier shall be permitted to analyze any Product rejected by Company for nonconformity to the Product Specifications, and to present its findings with respect to such Product to Company. If the Parties cannot agree on whether the Product in question conforms to the Product Specifications, an independent laboratory, reasonably acceptable to both Parties and at a cost equally shared by both Parties, shall analyze both Company's and Supplier's samples of Product in question, and the definitive results of such laboratory shall be binding. If Supplier agrees or it is determined that the shipment of Product in question fails to conform to the Product Specifications due to Supplier's fault, such nonconforming Product shall be held for Supplier's disposition, or shall be returned to Supplier, in each case at Supplier's expense, as directed by Supplier. In such case, Supplier shall at Supplier's expense use commercially reasonable efforts to replace each nonconforming shipment of Product, or the nonconforming portion thereof, with conforming Product as soon as reasonably practicable after receipt of notice of rejection thereof.

2.6.4    Latent Defects. Company shall notify Supplier in writing within thirty (30) days of its discovery of a Latent Defect. If it is determined that the Latent Defect is caused due to mishandling, improper storage, or negligent act or omission by Company, then Company shall be responsible for all associated costs including cost of goods, cost of accepting returns. If it is determined that the Latent Defect is caused by the negligent act and or omission by Supplier, then Supplier shall at Supplier's expense replace each nonconforming shipment of Product, or the nonconforming portion thereof, with conforming Product as soon as reasonably practicable after receipt of notice of rejection thereof. If the Parties cannot agree on whether the Product in question conforms to the Product Specifications, an independent laboratory, reasonably acceptable to both Parties and at a cost equally shared by both Parties, shall analyze samples of Product in question, and the definitive results of such laboratory shall be binding.

# ARTICLE III
# WARRANTIES

3.1     Product Warranty.    Supplier warrants to Company that all Product supplied to Company under this Agreement:  (a) conforms with the Product Specifications; (b) has been manufactured in accordance with Applicable Laws; (c) has not been adulterated or misbranded within the meaning of the Act; and (d) is merchantable, suitable and fit for the purposes for which it is intended under this Agreement. Except as expressly stated above, Supplier makes no other warranty as to Product performance or efficacy on administration to humans or animals.

3.2     Intellectual Property Warranty.    Licensor warrants to Company that Licensor has all rights and ownership in the Licensor's Intellectual Property, free and clear of any lien or claim of infringement of any third party; and to the best of Licensor's knowledge, without investigation, Supplier's manufacture and distribution of Product, and Company's manufacture, marketing, distribution and sale of the Licensed Product, all as contemplated by this Agreement, will not infringe upon the intellectual property rights of any third party.

**EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER LICENSOR, SUPPLIER OR COMPANY MAKES ANY OTHER WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED.**

# ARTICLE IV
# FURTHER OBLIGATIONS OF THE PARTIES

4.1     Inspection.    Company and its representatives shall have the right, on at least ten (10) business days prior written notice and during normal business hours, to inspect Supplier's applicable areas of production, manufacturing, packaging and warehousing facilities used in the manufacture, packaging, storage, testing, shipping and receiving of the Product. The frequency and extent of routine inspections shall be no more than once per calendar year, not to exceed two business days, unless upon just cause, or as otherwise mutually agreed to by the parties. Any information learned through such inspection shall be Confidential Information.

4.2     Reports.    Each Party shall promptly notify the others of its receipt of any inquiry, report, notice or action letter from any Governmental Body specifically addressing the Product or matters affecting a Party's performance under this Agreement.  Each Party shall provide to the others summaries of (i) all material correspondence, notices or responses received from any Governmental Body relating to the Product and its manufacture or marketing and sale, including, without limitation, all inspection reports issued by any such authority during the Term, and related correspondence, and (ii) reports and correspondence relating to the Product and its manufacture as become available in connection with any of the following events: (a) receipt of a Warning Letter or similar advisory from the FDA or any other Governmental Body relating to the manufacture, packaging and storage of the Product; and (b) any regulatory comments relating to the manufacture of the Product requiring a response or action by the

9

notifying party, including without limitation, any facilities inspection report and the Party's responses thereto.

## ARTICLE V
## INSURANCE

5.1 Supplier and Company shall maintain comprehensive general liability insurance, including product liability insurance against claims regarding the manufacture of Product under this Agreement, in amounts of not less than **$1,000,000** for each claim and **$2,000,000** in the aggregate as it customarily maintains for similar products and activities. Each Party shall maintain such insurance during the Term and thereafter for so long as it customarily maintains insurance for itself for similar products and activities. Each Party shall cause the other Party to be named as an additional insured under such insurance and shall provide the other Party proof of such insurance upon request. Each policy shall provide that the Party listed as additional insured shall be given at least thirty (30) days prior written notice of any cancellation, termination or change in such insurance.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

6.1 Each of Licensor, Supplier and Company represents and warrants to and covenants and agrees with the other as follows:

(i) It has full corporate power and authority to enter into this Agreement and consummate the transactions contemplated hereby.

(ii) It has such permits, licenses and authorizations of governmental or regulatory authorities as are necessary to own its respective properties, conduct its business and consummate the transactions contemplated hereby.

(iii) It is not currently debarred, suspended or otherwise excluded by the United States, under any Applicable Law, rule, and does not and will not use in any capacity the services of any person debarred under Applicable Law, in the performance of its obligations under this Agreement.

10

# ARTICLE VII
## INTELLECTUAL PROPERTY

7.1     Ownership of Intellectual Property.

      7.1.1     Title to and the right of enforcement for all Licensor Intellectual Property applicable to the Product (including, without limitation, the patents and patent applications) shall remain with Licensor. Licensor and Supplier shall from time to time make available to Company (as and when such data and information becomes available to either of them, and at no additional cost or expense to Company), all clinical data, stability data, and the like, relating to any combination of fish oil and any probiotic, including without limitation the Product, for Company's use in production, marketing and sale of Licensed Products.

      7.1.2     To the extent reasonably practical Company will mark all finished packaging or promotional materials for the Licensed Product with applicable Licensor's patent numbers or "patent pending" in accordance with 35 U.S.C. §287.

      7.1.3     Each of Licensor and Supplier acknowledges that it will not acquire any intellectual property rights in and to the Licensed Product developed by Company.

7.2     Prosecution, Enforcement and Defense of Intellectual Property

      7.2.1     Licensor will apply for, prosecute, and maintain during the term of this Agreement, the Licensor's Intellectual Property in the United States and in the foreign countries listed in Exhibit A hereto, subject to this Article VII.

      7.2.2     Company will be given reasonable opportunities to advise Licensor in the filing, prosecution, and maintenance of Licensor's Intellectual Property and will cooperate with Licensor in such filing, prosecution, and maintenance. At Company's request and expense, Company shall be provided with copes of all prosecution documents relating to Licensor's Intellectual Property so that Company may have the opportunity to offer comments and remarks thereon, such comments and remarks to be given due consideration by Licensor. However, notwithstanding anything to the contrary in this Agreement, all decisions with respect to the filing, prosecution, and maintenance of Licensor's Intellectual Property are reserved solely to Licensor.

      7.2.3     Each Party to this Agreement is obligated to inform the other promptly in writing of any alleged infringement of which it becomes aware and of any available evidence of infringement by a third party of any patents within the Licensor's Intellectual Property.

      7.2.4     If during the term of this Agreement, Company becomes aware of any alleged infringement by a third party, Company shall have the right, but not the obligation, to either:

            (a)     settle the infringement suit by sub-licensing the alleged infringer or by other means; or

(b)      prosecute at its own expense any infringement of the Licensor's Intellectual Property. In the event Company prosecutes such infringement, Company may, for such purposes, request to use the name of Licensor as party plaintiff. Licensor, at its sole discretion, may agree to become a party plaintiff, and all costs associated therewith shall be borne by Company.

7.2.5      In the event that Company undertakes the enforcement and/or defense of the Licensor's Intellectual Property by litigation, including any declaratory judgment action, the total cost of any such action commenced or defended solely by Company shall be borne by Company. Any recovery of damages by Company as a result of such action shall be applied first in satisfaction of any unreimbursed expenses and attorneys' fees of Company relating to the action, and second in satisfaction of unreimbursed legal expenses and attorneys' fees of Licensor, if any, relating to the action. If applicable, Company shall receive an amount equal to its lost profits or a reasonable royalty on sales of the infringer (whichever measure of damages the court shall have applied), less a reasonable approximation of the royalties that Company would have owed to Licensor on Net Sales that were lost to the infringer, which amount shall be promptly paid by Company to Licensor. Any balance remaining from such recovery shall be distributed between Company and Licensor with Company receiving seventy-five percent (75%) and Licensor receiving twenty-five percent (25%).

7.2.6      In the event Company does not undertake action to prevent the infringing activity within three (3) months of having been made aware and notified thereof, Licensor shall have the right, but not the obligation, to prosecute at its own expense any such infringements of the Licensor's Intellectual Property and, in furtherance of such right, Licensor may use the name of Company as a party plaintiff in any such suit without expense to Company. The total cost of any such infringement action commenced or defended solely by Licensor shall be borne by Licensor. Any recovery of damages by Licensor for any infringement shall be applied first in satisfaction of any unreimbursed expenses and attorneys' fees of Licensor relating to the suit, and second toward reimbursement of Company's reasonable expenses, including reasonable attorneys' fees, relating to the suit. Any balance remaining from such recovery shall be distributed with Licensor receiving one-hundred percent (100%).

7.2.7      In any infringement suit instituted by either party to enforce the Licensor's Intellectual Property in the Territory pursuant to this Agreement, the other party hereto shall, at the request and expense of the party initiating such suit, reasonably cooperate in all respects and, to the extent reasonably possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

7.2.8      If Licensor or Company is charged with infringement of a patent by a Third Party or is made a party in a civil action as a result of Company's or a sub-Company's importation, manufacture, use, distribution or marketing of Licensed Product in combination with other ingredients under this Agreement,

(a)      Company and Licensor will cooperate with each other in the defense and/or settle any such claim of infringement or civil action;

(b)     Company will bear all costs, expenses, damages, and other obligations for payments incurred as a consequence of such charges of infringement and/or civil action;

(c)     Company shall indemnify and hold Licensor harmless from any and all damages, losses, liability, and costs resulting from a charge of infringement or civil brought against Licensor and attributable solely to either (i) technology added to, incorporated into or sold with a Licensed Product by Company or a sub-Company or (ii) a manufacturing processes utilized by Company or a sub-Company; and

(d)  .  Company may, if such claim of infringement or civil action is based on patent claims contained in any pending or issued patent included in the Licensor's Intellectual Property, terminate this Agreement effective immediately upon Licensor's receipt of written notice of termination.

7.2.9          If Licensor or Company is charged with infringement of a patent by a Third Party or is made a party in a civil action as a result of Company's or a sub-Company's importation, manufacture, use, distribution or marketing of Licensed Product under this Agreement,

(a)     Company and Licensor will cooperate with each other in the defense and/or settle any such claim of infringement or civil action;

(b)     Licensor will bear all costs, expenses, damages, and other obligations for payments incurred as a consequence of such charges of infringement and/or civil action;

(c)     Licensor shall indemnify and hold Company harmless from any and all damages, losses, liability, and costs resulting from a charge of infringement or civil brought against Company and attributable solely to either (i) technology added to, incorporated into or sold with a Licensed Product by Licensor or a sub-Company or (ii) a manufacturing processes utilized by Licensor or a sub-Licensor; and

(d)     Company may, if such claim of infringement or civil action is based on patent claims contained in any pending or issued patent included in the Licensor's Intellectual Property, terminate this Agreement effective immediately upon Licensor's receipt of written notice of termination.

## ARTICLE VIII
## INDEMNIFICATION

8.1     (a) Supplier shall indemnify, defend and hold Company and its Affiliates and their respective directors, officers, employees, agents, successors and assigns harmless from and against any claim, action, suit, proceeding, loss, liability, damage, cost or expense (including without limitation reasonable attorneys' fees) arising directly or indirectly as a result of Supplier's negligent acts or omissions or willful misconduct in the manufacture of the Product or breach of

its representations, warranties, covenants or other obligations hereunder; provided, however that Supplier shall not be required to indemnify Company with respect to any claim, action, suit, proceeding, loss, liability, damage or expense to the extent arising from or related to Company's breach of its representations, warranties, covenants or other obligations hereunder or contained in Regulatory Applications.

(b) Licensor shall indemnify, defend and hold Company and its Affiliates and their respective directors, officers, employees, agents, successors and assigns harmless from and against any claim, action, suit, proceeding, loss, liability, damage, cost or expense (including without limitation reasonable attorneys' fees) arising directly or indirectly as a result of any claim of infringement.

8.2     Company shall indemnify, defend and hold each of Licensor and Supplier and their respective Affiliates and their respective directors, officers, employees, agents, successors and assigns harmless from and against any claim, action, suit, proceeding, loss, liability, damage, cost or expense (including without limitation reasonable attorney's fees) arising directly or indirectly as a result of Company's marketing, packaging, labeling, distribution, promotion, storage or handling of the Licensed Product, or Company's negligent acts or omissions or breach of its representations, warranties, covenants or other obligations hereunder; provided, however, that Company shall not be required to indemnify Licensor or Supplier with respect to any claim, action, suit, proceeding, loss, liability, damage or expense to the extent arising from or related to Licensor's or Supplier's breach of its representations, warranties, covenants or other obligations hereunder.

8.3     In the event Company, on the one hand, and Supplier and/or Licensor, on the other hand, are liable for a claim, liability shall be apportioned between the Parties in accordance with the Parties' relative fault for the damages claimed.

8.4     **NEITHER PARTY HEREUNDER SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, LOSS OPPORTUNITY OR USE OF ANY KIND, SUFFERED BY THE OTHER PARTY, WHETHER IN CONTRACT, TORT OR OTHERWISE, REGARDLESS AS TO WHETHER THE PARTY WAS ADVISED OF THE POSSIBILITY OF ANY SUCH LOSS.**

8.5     This Article VIII and the obligations contained herein shall survive termination of this Agreement, whether pursuant to Section 10.2 hereof, by expiration of the Term, or otherwise.

8.6     Indemnification Procedures for Third Party Claims. In the event that any legal proceedings shall be instituted or any claim or demand shall be asserted by any Third Party in respect of which the obligation to indemnify may arise under the provisions of this Article VIII, the indemnified Party shall promptly give or cause to be given to the indemnifying Party written notice thereof, and the indemnifying Party shall, at its expense, retain counsel of its choice in connection with the defense of any such proceeding, claim, or demand. The

14

indemnified Party shall have the right, at its choice and expense, to be represented by counsel of its choice to participate in the defense of any such proceeding, claim, or demand. The indemnified Party shall not admit liability with respect to any claim for which it is claiming indemnification, without the consent of the indemnifying Party. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation, or settlement of any such proceeding, claim, or demand; provided, the indemnifying Party shall have control of the defense of action for which it is obligated to provide indemnification, but may not settle such action without the consent of the indemnified Party, which consent shall not be unreasonably withheld or delayed.

## ARTICLE IX
## CONFIDENTIALITY AND PUBLIC DISCLOSURE

9.1    Confidentiality.  Each Party will treat as confidential the Confidential Information, and will take all necessary precautions to assure the confidentiality of such information. Each Party agrees to return to the other Party upon the expiration or termination of this Agreement all Confidential Information acquired from such other Party, except as to such information it may be required to retain under Applicable Law, and except for one copy of such information to be retained by such Party's legal department. Neither Party shall, during the Term or for three (3) years thereafter, without the other Party's express prior written consent use or disclose any such Confidential Information for any purpose other than in connection with its business and to carry out its obligations hereunder. Each Party, prior to disclosure of such Confidential Information to any employee, consultant, advisor or any other Person shall ensure that such Person is bound by confidentiality undertakings. The obligations of confidentiality shall not apply to information that the receiving Party is required by law or regulation to disclose, provided however that the receiving Party shall so notify the disclosing Party of its intent and cooperate with the disclosing Party on reasonable measures to protect the confidentiality of the information.

9.2    Public Disclosure.   Any Party's proposed announcement, news release, public statement, publication, or presentation relating to the existence of this Agreement, the subject matter hereof, or either Party's performance hereunder must be provided in advance to the other Party.   Except for such disclosure as is deemed necessary, in the reasonable judgment of a Party upon advice of counsel, to comply with Applicable Laws, no announcement, news release, public statement, publication, or presentation relating to the existence of this Agreement, the subject matter hereof, or either Party's performance hereunder will be made without the other Party's prior written approval, which approval shall not be unreasonably withheld. The Parties agree that they will use reasonable efforts to coordinate the initial announcement or press release relating to the existence of this Agreement to the extent that both Parties agree that such initial announcement or press release will be made, so that such initial announcement or press release by each may be made contemporaneously.

## ARTICLE X
## TERM AND TERMINATION

10.1    Term. Unless terminated earlier pursuant to Section 10.2 below, the initial term of this Agreement shall expire three (3) years from the Effective Date (the "Term"); provided, however, that the Term shall be automatically extended for successive additional periods of one (1) year each thereafter unless any Company gives to the others not less than six months' written notice of termination prior to the expiration of the initial Term, or any extended Term, of this Agreement.

10.2    Termination.

10.2.1    This Agreement may be terminated in its entirety immediately upon written notice of termination given by:

(a)    The non-defaulting Party in the event that the other Party shall: (A) commit a material breach or default under this Agreement, which breach or default shall not be remedied within sixty (60) days after the receipt of written notice thereof by the Party in breach or default; or (B) have made a material misrepresentation of any representation or warranty contained herein.

(b)    Either Party, upon the occurrence of either of the following:

i.    The entry of a decree or order for relief by a court having jurisdiction in the premises in respect of the other Party in an involuntary case under the United States Bankruptcy Code, as now constituted or hereafter amended, or any other applicable foreign, federal or state insolvency or other similar law and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days; or

ii.    The filing by the other Party of a petition for relief under the United States Bankruptcy Code, as now constituted or hereafter amended, or any other applicable foreign, federal or state insolvency law or other similar law.

10.3    Effects of Termination.

10.3.1    Termination By Supplier. If Supplier gives notice of non-renewal of the Term under Section 10.1, then for a period of three months following termination of this Agreement Supplier will continue to honor purchase orders placed before the termination date, so long as such purchase orders comply with the provisions of Article II of this Agreement.

10.3.2    If Supplier or Licensor gives notice of non-renewal of the Term under Section 10.1, then for a period of twelve months following termination of this Agreement, each of Supplier and Licensor agrees not to sell, market, promote or distribute, directly or indirectly, any product which would compete with any Licensed Product marketed by Company at any time during the Term.

10.3.3    Termination By Company. In the event this Agreement is terminated by Company due to a material breach by Supplier, Supplier shall use reasonable

commercial efforts to continue to satisfy Company's requirements for the Product consistent with the terms of this Agreement for a period of up to ninety (90) days.

10.3.4    Termination of this Agreement (whether under this section, on expiration of the Term or otherwise) shall be without prejudice to any rights of either Party against the other that may have accrued to the date of such termination. Upon termination of this Agreement, Company shall purchase from Supplier and pay Supplier for all Product for which Company has outstanding purchase orders that have been accepted by Supplier and shall reimburse Supplier for the cost of materials obtained by Supplier due to the rolling forecast provided by Company and which materials Supplier cannot use because of the termination of this Agreement.

10.4    The provisions of Article III, Article V, Article VIII, Article IX and Article X shall survive termination of this Agreement.

## ARTICLE XI
## MISCELLANEOUS

11.1    _Assignment_.   This Agreement shall inure to the benefit of, and shall be binding upon and inure to the benefit of and be enforceable by each of the Parties hereto and their respective successors and assigns. This Agreement cannot be assigned in whole or in part by any Party without the prior written consent of the others, except that Licensor and Supplier, on the one hand, or Company, on the other hand, may, without the prior written consent of the others, assign this Agreement, in whole or in part, to an Affiliate or to any Third Party or in connection with the sale or transfer of substantially all of its business or assets or in the case of its merger or consolidation; provided however that Supplier may not assign this Agreement or any of its rights or obligations hereunder to a competitor of Company.

11.2    _Force Majeure_.

(a)      If either Supplier or Company shall be prevented by fire; strike; lockouts; war; civil disturbances; acts of God; explosion; flood; earthquake; acts of terror, substantial unavailability, shortage or interruption in the usual supply of raw materials; severe weather; insurrection; riot; sabotage; accident; labor strike or labor disturbances; or orders or decrees of any court; or other similar events beyond the reasonable control of Supplier or Company ("Force Majeure") from performing its respective obligations hereunder, the obligations of such Party shall be suspended during the time and to the extent that such Party is prevented from complying therewith and such Party shall not be liable to the other Party hereto for damages for such failure to comply. The Party whose obligations hereunder have been suspended shall promptly and diligently pursue appropriate action to enable it to lift the Force Majeure situation, except that such Party shall not be obligated to settle any strike, lockout or other labor difficulty on terms contrary to its wishes. The terms of this Section shall not forgive or excuse any failure of a party hereto to make a payment to the other party or a third party when and as required under this Agreement.

(b)    In the event that any Force Majeure circumstance cannot be removed or overcome within six (6) months (or such other period as the Parties jointly shall determine) from the date the Party affected first became affected, then either Party may, as the expiration of such period by notice to the other Party terminate the term of this Agreement and neither Company nor Supplier shall be liable to the other for damages.

11.3    Notices.  All notices, reports and other communications required by this Agreement shall be transmitted by overnight courier service or by facsimile transmission with confirmed answer back to the other Party at its address set forth below, or such other address as shall be specified by the Parties hereto by written notice given in accordance with this Section and shall be effective upon receipt thereof.

If to Supplier or Licensor:

Probiohealth, LLC
9595 Wilshire Blvd. #810
Beverly Hills, CA 90212

with Copy to:

Probioferm, LLC
10215 Dennis Dr.
Urbandale, IA 50322

If to Company:

Nutrition 21, Inc.
Four Manhattanville Road, Suite 202,
Purchase New York 10557
Attn: Chief Executive Officer

with a copy to:   its General Counsel at the same address.

11.4    Amendment and Waiver.  This Agreement may be amended, modified, superseded or canceled, and any other of the terms or conditions hereof may be modified, only by a written instrument executed by all Parties hereto or, in the case of a waiver, by the Party waiving compliance. Failure of either Party at any time or times to require performance of any provision hereof shall in no manner affect the right of such Party at a later time to enforce the same, and no waiver of any nature, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or considered as a further or continuing waiver of any other provision of this Agreement.

11.5    Severability.  In the event that any one or more of the agreements, provisions or terms contained herein shall be declared invalid, illegal or unenforceable in any respect, the validity of the remaining agreements, provisions of terms contained herein shall in no way be affected, prejudiced or invalidated thereby.

18

11.6  Entire Agreement.  This Agreement, together with the Exhibits hereto, contains the entire agreement between the Parties hereto and supersedes any agreements between them with respect to the subject matter hereof.

11.7  Section Headings.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.8  Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument.

11.9  Independent Contractor.  Company's and Licensor's, Supplier's relationship under this Agreement shall be that of independent contractor. Nothing in this Agreement shall be deemed or construed by the Parties hereto or by any third parties creating the relationship of principal and agent, employer and employee or of partnership or of joint venture between the Parties hereto.

11.10  Dispute Resolution.

(a)  Good Faith Negotiation. The parties agree that, before resorting to any formal dispute resolution process concerning any dispute arising from or in any way relating to this Agreement (a "Dispute"), they will first attempt to engage in good faith negotiations in an effort to find a solution that serves their respective and mutual interests, including their continuing business/professional relationship.  If after ten (10) days following receipt of notice by one Party from the other of a Dispute, the parties are unable to resolve the Dispute, then within five (5) business days following the end of such ten (10) day period, the parties shall each appoint a principal to personally review the facts of the Dispute and seek to resolve the matter by means of direct discussion between the appointed principals. Unless otherwise agreed in writing, the parties shall have five (5) business days from the date the principals are appointed to begin the direct discussions between them and ten (10) business days to resolve the Dispute by such direct discussions.

(b)  Mediation.  If the principals are not appointed, or the negotiations do not take place within the time provided above, or if the negotiations do not conclude with a mutually agreed upon solution within that time frame (or its agreed upon extension), the parties agree to mediate any Dispute. If the Parties cannot agree upon a mediator within ten (10) days following the conclusion of their good faith negotiations or expiration of the time within which to negotiate as provided above, then each shall select one name from a list of mediators maintained by any *bona fide* dispute resolution provider or other private mediator; the two selected shall then choose a third person who will serve as mediator. The Parties agree to appoint principals to participate in the mediation process, including being reasonably present throughout the mediation session(s). The Parties shall have thirty (30) days within which to commence the first mediation session following the conclusion of their good faith negotiations or expiration of the time within which to negotiate as provided above. The parties further confirm

their motivating purpose in selecting mediation is to find a solution that serves their respective and mutual interests, including their continuing business/professional relationship.

(c) <u>Costs</u>. The parties agree to share the mediator's fees equally.

(d) <u>Notice of Dispute</u>. The notice of a Dispute shall be in writing. It shall provide sufficient details of the Dispute to apprise the other party of the basis of the disputant's claims. The notice should include the invitation to begin negotiation, and where unsuccessful, mediation.

(e) <u>Litigation</u>. Should the negotiations and mediations contemplated by this Section fail to achieve a mutually acceptable resolution of the Dispute, either party may file a lawsuit related to the Dispute.

(f) <u>Injunctive Relief</u>. Each party has the right before or during the negotiation and/or mediation contemplated by this Section to seek and obtain from a court of competent jurisdiction equitable relief in the form of preliminary injunction to avoid irreparable harm, maintain the status quo or preserve the subject matter of the Dispute.

11.11  Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles relating to conflicts of laws. The federal courts located in the State of New York and courts of the State of New York shall have exclusive jurisdiction to hear any and all disputes arising under or concerning this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

PROBIOHEALTH, LLC.

By: _____
        Authorized Officer


PROBIOFERM, LLC.

By: _____
        Authorized Officer


NUTRITION 21, INC.

By: _____
        Authorized Officer

**EXHIBIT A**

**PRODUCT DESCRIPTIONS, SPECIFICATIONS**

Supplier's proprietary probiotic strain covered by ATCC accession number PTA 3925, currently designated by Licensor and Supplier as "KE-01" and "KE-99."

Product Specification and related manufacturing documentation will be provided upon request.

# Product Specification: *Lactobacillus casei* KE99
## *Durabac* Encapsulated - 50 Billion CFU/gram

| Product | Encapsulated *Lactobacillus casei* KE99 – 50 Billion |
|---|---|
| Concentration | $5.0 \times 10^{10}$ CFU/gm |
| Dosage | Application and customer dependant |

| | |
|---|---|
| Physical Properties | Product appearance is white to off-white, free flowing granules with little odor. Size: 92% > 0.2 mm and < 1.0 mm |
| Foreign Material | Shall be free of all substances and degrading physical characteristics, which are deleterious to human consumption. |
| Package | Standard is 10 kilogram poly lined pails. Other options available |
| Storage | Product stored in cool dry area in properly sealed containers. Refrigeration is recommended. |
| Labeling | Product name |
| | Lot number: Manufacturing date written backwards. |
| | Package size/weight |
| Shelf Life | Product shall have a shelf life of one year when stored at 22 degrees C or below. |
| Composition | *Lactobacillus casei* KE99, Anhydrous dextrose, Maltodextrin and Vegetable fat |
| Safety | This product is considered non-toxic and is harmless to humans and animals. It leaves no residues and has no withdrawal times. This product is considered GRAS by the US FDA. Product contains trace amounts of derivatives from milk. |

## Critical Parameters

| Critical Parameters | Acceptance Criteria | |
|---|---|---|
| Active Culture: *L. casei* KE-99 | | |
| Aerobic mesophilic | $5.0 \times 10^{10}$ cfu/gm | Minimum |
| Yeasts | 10,000 cfu/gm | Maximum |
| Molds | 1 cfu/gm | Maximum |
| Coliforms | 1 cfu/gm | Maximum |
| *E. coli* | <10 cfu/gm | Maximum |
| *Salmonella sp.* | Negative | |
| *Shigella sp.* | Negative | |
| *Staphylococcus sp.* | Negative | |

**SCHEDULE A**
**LICENSED PATENTS**

Issued Patents:

U.S. Patent No. 7,214, 370 issued May 8, 2007

Pending Patent Applications:

U.S. patent application no. 11/734,176 filed April 11, 2007

# AMENDMENT NO. 2 TO LICENSE AND SUPPLY AGREEMENT

Amendment No. 2 dated as of January 3/ , 2011 ("Amendment 2") to the License and Supply Agreement dated August 6, 2009 by and among Probiohealth, LLC ("Licensor"), Probioferm, LLC ("Supplier"), and Nutrition 21, Inc. ("Company") as amended on August 12, 2009 (collectively the "2009 Agreement"). All capitalized terms not defined in this Amendment No. 2 shall have the meaning set forth in the 2009 Agreement. The Licensor, Supplier and Company are called collectively the "Parties".

## RECITALS

The Parties agree that in order to more rapidly expand the market it is in their collective best interest to amend the 2009 Agreement to provide for:

- Licensor and Supplier agree to allow Company to sell the probiotic designated as either KE-99 or KE-01;
- Expansion of the license to include combinations of probiotics other than either KE-99 or KE-01 with Omega 3 oils containing a minimum of 30% DHA content, in which case Company will either purchase the probiotics from Supplier or pay the Licensor a royalty for use of the Licensed Patents;
- A more flexible schedule for ordering and manufacturing of the probiotics so that Supplier's ability to service other customers is not impeded; and
- A commitment by Company to begin and complete a human clinical study of the combination of fish oil and KE-99.

NOW, THEREFORE, in consideration of the foregoing, and the mutual covenants and obligations set forth herein, Licensor, Supplier and Company hereby agree as follows:

Section 2.1 of the 2009 Agreement is replaced as follows:

2.1 License Grant.

(a) Licensor hereby grants to Company an exclusive license (subject to Section 2.5.3 hereof) under Licensor's Patents and Pending Patents, including the patents and applications listed on Schedule A hereto, to import, manufacture, use, distribute and market in the Territory nutritional supplement products consisting of combinations of fish oils with probiotics currently designated KE-01 and KE-99 as described in Exhibit A (the "Proprietary Strain") for human administration or animal administration (each, a "Licensed Product"). Supplier and Company may at a future time enter into a separate agreement to allow Company to market the Proprietary Strain with specific edible oils other than fish oil.

(b) Licensor hereby grants to Company a license (subject to Section 2.5.3 hereof) under Licensor's Patents and Pending Patents, including the patents and applications listed on Schedule A hereto, to import, manufacture, use, distribute and market in the Territory nutritional supplement products consisting of combinations of one or more edible oils with a minimum of

30% DHA content together with one or more probiotics for human administration or animal administration (each, a "Licensed Product").

(c) In addition, Licensor hereby agrees to allow Company under Licensor's Patents and Pending Patents, including the patents and applications listed on Schedule A hereto, to import, manufacture, use, distribute and market the probiotic designated as either KE-99 or KE-01 for human administration or animal administration (each, a "Licensed Product").

Section 2.4.2.1 of the 2009 Agreement is replaced as follows:

Section 2.4.2.1 Supply Obligations

(a) Company agrees to purchase all of its requirements of the Proprietary Strain for any and all purposes including use in Licensed Products in the Territory from Supplier, on an exclusive basis, all on terms contained in this Agreement.

(b) Company may purchase its requirements of Products other than the Proprietary Strain for any and all purposes including use in Licensed Products in the Territory from Supplier all on terms contained in this Agreement.

(c) In the event that Company purchases Products other than the Proprietary Strain from third parties, Company will pay a royalty of ___ % of the amount paid for all such Products which are sold for uses covered by the Licensed Patents. In the event Licensor's Patents are held invalid or expire, Company's obligation to pay royalties will end.

Section 2.5.2 (iii), (iv), and (v) of the 2009 Agreement are replaced and Section 2.5.2 (vi) is added as follows:

(iii) During months seventeen through nineteen (the period of January through March 31, 2011), Company will purchase a minimum of ninety (90) kilograms of Product at a purchase price of $1,000 per kilogram. So that Probioferm has the ability to service other customers during that period, Company shall purchase thirty (30) kilograms for delivery during the month of January, payable January 31, 2011; thirty (30) kilograms for delivery during the month of February, payable February 28, 2011; and thirty (30) kilograms for delivery during the month of March, payable March 31, 2011.

(iv) During months twenty through twenty-four, Company will target to purchase a minimum of ninety (90) kilograms of Product at a purchase price of $1,000 per kilogram. Any Product purchases in excess of ninety (90) kilograms will be at $900 per kilogram.

(v) During months twenty-five through thirty-six of the Term, Company will target to purchase a minimum of two-hundred forty (240) kilograms of Product as a

purchase price of $800 per kilogram. Any Product purchases in excess of two hundred forty (240) kilograms during months thirteen through twenty four of the Term will be at $750 per kilogram.

(vi) For all periods after month thirty six of the Term, the purchase price of the Product shall be $750 per kilogram.

Add the following Section:

2.7   Clinical Studies:

Company agrees to conduct a minimum of one (1) human clinical study to be completed no later than June 30, 2011. The study will be designed as a double-blind placebo-controlled study and will be of a quality to qualify for peer-review publishing. Licensor will be given the opportunity to make recommendations on the study protocol. The Parties may choose to collaborate on additional clinical studies to establish superior efficacy and specific health-related outcomes.

Schedule A is replaced with the Following

Issued Patent:

U.S. Patent No. 7,214,370 issued May 8, 2007

Pending Patent Application:

U.S. patent application no. 11/734,176 filed April 11, 2007

Other Patents and Applications based on the above-identified Issued Patent and Application and other patents and applications under which Licensor or Supplier have the right to grant licenses.

PROBIOHEALTH, LLC          PROBIOFERM, LLC          NUTRITION 21, INC.

By: _____        By: _____      By: _____
Authorized Officer         Authorized Officer        Authorized Officer

# EXHIBIT "B"

# AMENDMENT NO. 2 TO LICENSE AND SUPPLY AGREEMENT

Amendment No. 2 dated as of January 3 / , 2011 ("Amendment 2") to the License and Supply Agreement dated August 6, 2009 by and among Probiohealth, LLC ("Licensor"), Probioferm, LLC ("Supplier"), and Nutrition 21, Inc. ("Company") as amended on August 12, 2009 (collectively the "2009 Agreement"). All capitalized terms not defined in this Amendment No. 2 shall have the meaning set forth in the 2009 Agreement. The Licensor, Supplier and Company are called collectively the "Parties".

## RECITALS

The Parties agree that in order to more rapidly expand the market it is in their collective best interest to amend the 2009 Agreement to provide for:

- Licensor and Supplier agree to allow Company to sell the probiotic designated as either KE-99 or KE-01;
- Expansion of the license to include combinations of probiotics other than either KE-99 or KE-01 with Omega 3 oils containing a minimum of 30% DHA content, in which case Company will either purchase the probiotics from Supplier or pay the Licensor a royalty for use of the Licensed Patents;
- A more flexible schedule for ordering and manufacturing of the probiotics so that Supplier's ability to service other customers is not impeded; and
- A commitment by Company to begin and complete a human clinical study of the combination of fish oil and KE-99.

NOW, THEREFORE, in consideration of the foregoing, and the mutual covenants and obligations set forth herein, Licensor, Supplier and Company hereby agree as follows:

Section 2.1 of the 2009 Agreement is replaced as follows:

2.1 License Grant.

(a) Licensor hereby grants to Company an exclusive license (subject to Section 2.5.3 hereof) under Licensor's Patents and Pending Patents, including the patents and applications listed on Schedule A hereto, to import, manufacture, use, distribute and market in the Territory nutritional supplement products consisting of combinations of fish oils with probiotics currently designated KE-01 and KE-99 as described in Exhibit A (the "Proprietary Strain") for human administration or animal administration (each, a "Licensed Product"). Supplier and Company may at a future time enter into a separate agreement to allow Company to market the Proprietary Strain with specific edible oils other than fish oil.

(b) Licensor hereby grants to Company a license (subject to Section 2.5.3 hereof) under Licensor's Patents and Pending Patents, including the patents and applications listed on Schedule A hereto, to import, manufacture, use, distribute and market in the Territory nutritional supplement products consisting of combinations of one or more edible oils with a minimum of

30% DHA content together with one or more probiotics for human administration or animal administration (each, a "Licensed Product").

(c) In addition, Licensor hereby agrees to allow Company under Licensor's Patents and Pending Patents, including the patents and applications listed on Schedule A hereto, to import, manufacture, use, distribute and market the probiotic designated as either KE-99 or KE-01 for human administration or animal administration (each, a "Licensed Product").

Section 2.4.2.1 of the 2009 Agreement is replaced as follows:

Section 2.4.2.1 Supply Obligations

(a) Company agrees to purchase all of its requirements of the Proprietary Strain for any and all purposes including use in Licensed Products in the Territory from Supplier, on an exclusive basis, all on terms contained in this Agreement.

(b) Company may purchase its requirements of Products other than the Proprietary Strain for any and all purposes including use in Licensed Products in the Territory from Supplier all on terms contained in this Agreement.

(c) In the event that Company purchases Products other than the Proprietary Strain from third parties, Company will pay a royalty of ___ % of the amount paid for all such Products which are sold for uses covered by the Licensed Patents. In the event Licensor's Patents are held invalid or expire, Company's obligation to pay royalties will end.

Section 2.5.2 (iii), (iv), and (v) of the 2009 Agreement are replaced and Section 2.5.2 (vi) is added as follows:

(iii) During months seventeen through nineteen (the period of January through March 31, 2011), Company will purchase a minimum of ninety (90) kilograms of Product at a purchase price of $1,000 per kilogram. So that Probioferm has the ability to service other customers during that period, Company shall purchase thirty (30) kilograms for delivery during the month of January, payable January 31, 2011; thirty (30) kilograms for delivery during the month of February, payable February 28, 2011; and thirty (30) kilograms for delivery during the month of March, payable March 31, 2011.

(iv) During months twenty through twenty-four, Company will target to purchase a minimum of ninety (90) kilograms of Product at a purchase price of $1,000 per kilogram. Any Product purchases in excess of ninety (90) kilograms will be at $900 per kilogram.

(v) During months twenty-five through thirty-six of the Term, Company will target to purchase a minimum of two-hundred forty (240) kilograms of Product as a

purchase price of $800 per kilogram. Any Product purchases in excess of two hundred forty (240) kilograms during months thirteen through twenty four of the Term will be at $750 per kilogram.

(vi) For all periods after month thirty six of the Term, the purchase price of the Product shall be $750 per kilogram.

Add the following Section:

2.7    Clinical Studies;

Company agrees to conduct a minimum of one (1) human clinical study to be completed no later than June 30, 2011. The study will be designed as a double-blind placebo-controlled study and will be of a quality to qualify for peer-review publishing. Licensor will be given the opportunity to make recommendations on the study protocol. The Parties may choose to collaborate on additional clinical studies to establish superior efficacy and specific health-related outcomes.

Schedule A is replaced with the Following

Issued Patent:

U.S. Patent No. 7,214, 370 issued May 8, 2007

Pending Patent Application:

U.S. patent application no. 11/734,176 filed April 11, 2007

Other Patents and Applications based on the above-identified Issued Patent and Application and other patents and applications under which Licensor or Supplier have the right to grant licenses.

PROBIOHEALTH, LLC      PROBIOFERM, LLC      NUTRITION 21, INC.

By: _____      By: _____      By: _____
    Authorized Officer          Authorized Officer          Authorized Officer